ST. LOUIS & S. F. R. CO. VS PFENNIGHAUSEN.

Opinion rendered Sept. 26, 1907.

(104 S. W. Rep. 880).

*Railroads—Indian Territory Lands.*

By the Curtis bill and Act March 1, 1901, c. 676, 31 Stat. 861, citizens of a town not regularly platted obtained the right to buy lots whereon they had made improvements, when the town was incorporated

and laid off into lots, the Creek Nation retaining title until the consideration was paid. In a railroad's right of way condemnation proceedings it was held that citizens who had made improvements on lots could recover the market value of their holdings, including the market value of their interest in the land as well as the value of the improvements, though no plat had been filed and they had made no payments.

Error to the United States Court for the Western District of the Indian Territory; before Justice Louis Sulzbacher, May 27, 1905.

Condemnation proceedings by the St. Louis & San Francisco Railroad Company against R. W. Pfennighausen. From the judgment, the railroad company brings error. Affirmed.

This is an appeal from a condemnation proceeding, wherein the railroad company sought to condemn a piece of land situated in the town of Sapulpa, in the Creek Nation. The proceedings were instituted under and in conformity with an act of Congress entitled, "An act to grant the right of way through Oklahoma Territory and the Indian Territory to the Enid and Anadarko Railway Company, and for other purposes," approved February 28, 1902 (32 Stat. 43, c. 134 [U. S. Comp. St. Supp. 1905, p. 370]). The referees appointed awarded to the defendant in error the sum of $85 for his damages, which was duly paid into court, and the railway company took pos-:session of the land. The defendant in error, not being satisfied with the award, appealed to the United States Court for the Western district of the Indian Territory. At the trial of the appeal from the award of the referees in that court, where the case was duly tried de novo, the following agreed statement of facts was filed and read to the jury, to wit: "It is agreed between the parties to this cause: (1) That the whole of the land described in the complaint was taken and appropriated by condemnation proceedings begun by the defendant, said

proceedings being properly and legally conducted. (2) That said land was at the time within the limits of the townsite of Sapulpa, in the Western district of the Indian Territory, as the same was surveyed and platted by the Secretary of the Interior. (3) That the letter from J. George Wright, United States Indian inspector, hereto attached, shall be considered as proof of the facts therein stated." The letter is as follows: "Department of the Interior. United States Indian Inspector for Indian Territory. Muskogee, Ind. Ter. April 16, 1904. Mr. W. W. Wood, Okmulgee, Indian Territory—Sir: In response to your request for information as to the segregation of the townsite of Sapulpa, in the Creek Nation, you are respectfully advised that the exterior limits of this townsite were reported established by the surveyor on January 1, 1901. The report was actually approved by the Secretary of the Interior on February 15, 1901, setting aside and reserving from allotment 501.25 acres. The plat showing the subdivisional survey into lots and blocks, etc., was approved by the Secretary of the Interior August 21, 1902. Very respectfully, J. Geo. Wright, U. S. Indian Inspector for Indian Territory." "(4) That the Creek townsite commission appeared to appraise and schedule lots and lands in said town of Sapulpa after the 1st day of August, 1902. (5) That there was a collection of business and dwelling houses, depot and railroad station, and town called Sapulpa at this point for 12 years or more prior to 1902. That this town was incorporated in the spring of 1899, and the property in controversy was within the original town and within the limits as incorporated. (6) That on and prior to the 6th day of June, 1898, one Henry Golden, an intermarried Creek citizen, was in the possession of the land in controversy, having improvements thereon. (7) That, as such intermarried citizen, he had the right to hold and occupy lands in towns in the Creek Nation. (8) That on said 6th day of June, 1898, said Henry Golden sold and delivered the possessory

rights of said land and the improvements thereon to James S. McAlister, who continued in the possession thereof until the 24th day of May, 1902. (9) That on the 24th day of May, 1902, the said James S. McAlister sold and delivered the possessory right of said land and the improvements thereon to the plaintiff, and the plaintiff continued in the possession thereof down to the time of the condemnation and appropriation thereof by the defendant. (10) That the land in controversy is a part of an irregular tract within the survey of the town of Sapulpa, marked as 'Block 3,' but is not subdivided. (11) That under said condemnation proceedings the defendant condemned and paid for the interest of the Creek Nation in said land." The defendant in error made no objection to the proceedings further than that the sum awarded, $85, was not the full and fair value of his interest in the land, and claimed that it was reasonably worth the sum of $700, for which he prayed judgment. The case was tried to a jury. Verdict for $751.68, $51.68 of which was remitted, and judgment for $700, the sum demanded by the pleadings.

*P. L. Soper* and *W. T. Hutchings*, for plaintiff in error.

*W. W. Wood*, for defendant in error.

CLAYTON, J. (after stating the facts as above). It appears from the proof that the town of Sapulpa, had, prior to the institution of the condemnation proceedings by the railway company, been segregated from the public domain of the Creek Nation by a government survey designating the exterior boundary lines of the town, and approved by the Secretary of the Interior February 15, 1901. The condemnation proceedings were instituted June 3, 1902. The lots were not appraised and scheduled until after August 1, 1902, and the plat, dividing the town off into streets and alleys, blocks and lots, was not approved until August 21, 1902, a few months after the institution of the suit.

It is claimed by the railroad company that as the town had not been subdivided into streets and alleys, blocks, and lots, and the lots had not been appraised and scheduled to the different claimants at the time of the beginning of the suit, and as the title was still in the Creek Nation, that the defendant in error was only entitled to the value of his improvements on the lot as his damages; while the defendant in error claims that he was entitled to the market value of his holdings, including not only the value of his improvements on the land, but also the then present market value of his prospective interest in the land. And this is the only question in the case.

Before the proceedings began, Sapulpa had been a town for 12 years—not in the legal sense, it is true, but an aggregation of people which entitled them to all of the advantages of the Curtis bill when enacted. Up to the time of the passage of that bill, as between these people and the Creek Nation, they were only squatters and trespassers, without any title, legal or equitable, to the land. But, as between themselves and others dealing with them in relation to the lands having full knowledge of the situation, the courts have always recognized their contracts relating to them. Walker Trading Co. vs Grady Trading Co., 1 Ind. Ter. 191, 39 S. W. 354. Among themselves they bought and sold town lots, executed mortgages upon them and leased them to tenants, and, as already said, the courts upheld their contracts; and thus it was that these early town builders, without title, established a market value for their possessory rights, whatever they may have been. But, when the Curtis bill was passed, Congress by that act, and the Creek Nation, by its agreement, recognizing that white men, by virtue of the fact that their money and their energy and industry in building the towns had greatly enhanced the value of the land, thereby creating some sort of an equity in their favor, enacted and agreed that the towns should be segregated and incorporated, and laid off into lots, and the lots, not including the improvements,

should be appraised at their fee-simple value, and that the owner of the improvements should have the right to buy them, securing a fee-simple title, by paying one-half of the appraised value of the lot, the legal title to remain in the Creek Nation until the consideration was paid. Congress and the Creek Nation by this act and agreement declared and fixed the relative interests of the Creek Nation and the owner of the improvement on the lot as being equal, each one-half; and the fact that the title was to remain in the Creek Nation as security for the payment to it of its share by the owner of the improvement had no tendency to lessen the value of his half interest, nor was his interest so remote or uncertain that its value could not be ascertained. The act of March 1, 1901, entitled, "An act to ratify and confirm an agreement with the Muskogee or Creek Indians, and for other purposes" (31 Stat. 861, c. 676), as far as the contention in this case is concerned, is not materially different from the agreement contained in the Curtis bill. Upon the enactment of these statutes, the citizens of Sapulpa in possession of improved town property were no longer squatters and trespassers, especially after the segregation of the land by surveying the limits of the town and its approval by the Secretary of the Interior. The statute made their possession a lawful and a valuable one, and it makes no difference whether payments had been made or not, or whether or not the right to or in the land was a vested one in the sense that the government and the Creek Nation might repeal the statute and abrogate the right. This contest is not between the government and the Creek Nation on the one side and the defendant in error on the other, but it is between the defendant in error and a company having no interest in the legislation and agreements, which were the foundation and the source of this valuable right to the possession and ultimately the ownership in fee of these lands.

The contention that up to the time of the commencement of these proceedings there had been no payment made on the

lot, and therefore defendant in error had no title or right which would entitle him to compensation in a condemnation suit, is not well founded. In the first place, it is not necessary that he should have owned the fee in the land. "If the land is taken from one who owns less than the fee, he can recover for the diminished value of whatever interest he has, and that only." 15 Enc. Law & Pr. 693, and cases cited. A settler on public lands who has made a valid homestead entry and is in possession perfecting his title is entitled to the value of the injury done his possession. Ellsworth, etc., R. Co. vs Gates, 41 Kan. 574, 21 Pac. 632. But in this case there was something more than mere possession, with right to perfect title. The statute and the agreement granted this right on the theory that the money and labor expended in improving the lands within the town limits was equal to one-half of the value of the lands, and was the equivalent of a payment to that extent, and equitably at least they might be regarded as one-half owners, with the privilege of buying the other half at its appraised value. If the contention of the railway company be correct, in this case and all cases of this kind in the condemnation of land by railroad companies, the result would be that the one-half interest of the Creek Nation would be ascertained and paid, the value of the improvements would be paid to the occupant, and not only the prospective half interest of the occupant in the land would be cut off, but the half interest itself would be acquired by the company without compensation, simply because the company stepped in and took it before the time had arrived under the statute when the occupant of the land could make his payments and perfect his title; and thus all of the benefits intended by the statute to be conferred on the occupant in consideration of the expenditure of the money and labor he had made would go without consideration to the railroad company. The law does not tolerate such injustice. The defendant in error had a legal and a valuable interest in the land which could not be

acquired by condemnation, or other proceedings, without compensation.

The court charged the jury as follows: "The court instructs the jury that under the admitted facts in this case the plaintiff had the right, by holding the possession of the property in controversy and making improvement thereon other than temporary buildings, fences, and tillage, prior to the appearance of the townsite commission, to have the same scheduled to him, and to be awarded the right to purchase the same by paying one-half of the appraised value thereof to the Creek Nation; and, if you believe from the evidence that plaintiff was damaged by being deprived of that right, then your verdict should be for the plaintiff. If you find for the plaintiff, you will assess his damages at the reasonable market value of his interest in said property, as above defined, on the 30th day of June, 1902, as shown by the evidence. To the sum so found you will add interest at the rate of 6 per cent. per annum from the 30th day of June, 1902." It is our opinion that under the admitted facts the charge of the court, the verdict of the jury as amended, and the judgment of the court were correct.

The judgment of the court below is affirmed.

GILL, C. J., and TOWNSEND and LAWRENCE, JJ., concur.