## TURNER v. KIRKWOOD et al.

No. 21013. April 17, 1934.

R. W. Stoutz, for plaintiff in error.

Breckinridge & Bostick and West, Gibson, Sherman, Davidson & Hull, for defendants in error.

ANDREWS, J. This is an appeal by the plaintiff in the district court of Tulsa county, Okla., from a judgment of that court in favor of the defendants therein.

The record shows that prior to 1895, William Mann and Betty Mann, two full-blood Creek Indians, placed certain improvements upon a portion of the tribal lands of the Creek Nation within what was then known as the village of Tulsa and occupied that portion thereof; that the portion thereof so occupied is the land involved in this action; that during that year C. B. Lynch and R. E. Lynch, licensed traders among the Creek Indians, acquired from those Indians all of the rights in the land and improvements thereon that those Indians could convey under the law as it existed at that time; that they erected thereon a two-story stone building covering substantially all of the front of the property involved in this action; that thereafter the land comprising the village of Tulsa was platted into lots and blocks and the land involved in this action was designated as lot 25 and the north 19½ feet of lot 24 in block 89 in the town of Tulsa, Okla.; that C. B. Lynch and R. E. Lynch occupied the land in question up to September 7, 1898, at which time they sold whatever right they had in the building and land to John E. Turner, sometimes called John Turner; that he placed his son, Fred E. Turner, the plaintiff, in charge of the property under an agreement, the details of which will be referred to hereinafter; that Fred E. Turner took charge of the property under that agreement; that since that time he has been in possession thereof either personally or by tenant; that John E. Turner died on December 10, 1898, leaving a will, the details of which will be referred to hereinafter; that John E. Turner was survived by his widow, Julia A. Turner, his daughter, Effie Kirkwood, his two sons, Clarence W. Turner and Fred E. Turner, and seven grandchildren; that the will of John E. Turner was duly admitted to probate; that Clarence W. Turner qualified as executor of the estate; that a proceeding was instituted in court for the construction of the will, the details of which will be referred to hereinafter; that while that litigation was pending, lot 25 was scheduled in the name of Fred E. Turner and the part of lot 24 as "contested"; that after the conclusion of that litigation lot 25 was scheduled by supplemental schedule in the name of the estate of John E. Turner, deceased; that no supplemental schedule was made as to the part of

lot 24; that the executors of the estate of John E. Turner, deceased, paid one-half of the appraised value of lot 25 and received a patent therefor, dated September 16, 1906, in the name of the heirs of John E. Turner, deceased, and that Fred E. Turner paid one half of the appraised value of the part of lot 24 and received a patent therefor, dated September 5, 1906, in his name. For convenience the property will be referred to hereinafter as lot 24 and lot 25.

The agreement between John E. Turner and Fred E. Turner, hereinbefore referred to, was that John E. Turner should furnish to Fred E. Turner sufficient capital to enable Fred E. Turner to increase the stock of goods then in the store building from $1,800 to $10,000; that Fred E. Turner was to take possession of the property, operate the business, pay all expenses of operation, maintain the stock at a value of $10,000 and have all of the profit derived from the operation of the business during his lifetime, and that the property should remain the property of John E. Turner.

The will of John E. Turner, hereinbefore referred to, in so far as it related to the property in question, provided:

"Fourth. I give devise and bequeath to my son Fred E. Turner during the remainder of his natural life, my two store stone building together with the basement and adjoining buildings in the town of Tulsa Indian Territory being the property recently purchased by me from the Lynch Mercantile Company, also a stock of general merchandise of the value of ten thousand dollars, the same to be kept up to that amount or the money in lieu thereof loaned out and only the interest used. Said Fred E. Turner shall collect the rents from the said building and out of the rents keep the buildings in good repair and shall be entitled to all of the profits of the Mercantile business or the interest on the money as the case may be and all of the rents after paying for the repairs as long as he lives, but upon his said death said stock of merchandise and said building shall be sold and converted into money and the same divided among my seven grandchildren now living as above named and paid to them as above provided for."

It will be noted that there was no reference therein to any town lot or real estate.

The proceedings for the construction of the will, hereinbefore referred to, were commenced in the United States Court for the Northern District of the Indian Territory by Fred E. Turner, the plaintiff, and Julia A. Turner, the widow of John E. Turner, deceased. On appeal from a judgment of that

court, the Court of Appeals of the Indian Territory held that under the provisions of the will Fred E. Turner acquired an absolute title to the stock of goods. It refused to express any opinion as to the title to the building. No reference was made to the lots. Before that decree became final the parties to that litigation entered into an agreement for a settlement, and that settlement agreement was adopted by that court and judgment was rendered by it accordingly. That portion of that judgment pertaining to the issues in this case was as follows:

"* * * First: That the stock of merchandise mentioned in the will of John E. Turner, deceased, be, and the same is absolutely vested in Fred E. Turner, in fee simple as his absolute property without any remainder or accounting to any other party whatsoever.

"Second: That the store building mentioned in the will of said John E. Turner, deceased, and devised to Fred E. Turner for life and the remainder for the grandchildren of said John E. Turner, deceased, be and the same is hereby declared to be the property of Fred E. Turner for his natural life, and that the remainder vest in the grandchildren of the said John E. Turner who are described and set forth in his will. * * *"

It will be noted that there was no reference therein to either of the town lots involved in this action.

The scheduling and valuation of the property, hereinbefore referred to, was made with reference to the improvements thereon which were referred to therein as "store building." The appraised value of the two lots was substantially the same. The record shows that Fred E. Turner did not request that scheduling; that the town site office in which the scheduling was done was in the rear of the building in question; that the scheduling was done without the knowledge of Fred E. Turner; that notice of the scheduling of lot 25 was served on Fred E. Turner on July 10, 1902; that notice of the scheduling of lot 24 was served on him on December 6, 1902, and that at the time of that scheduling the litigation in the United States court was pending. It appears that nothing was done by Fred E. Turner to perfect the title to either of the lots in himself until after the determination of the litigation in the United States court. As hereinbefore stated, after the determination thereof and on June 9, 1904, a supplemental schedule of lot 25 was made by which that lot was scheduled to the estate of John E. Turner, deceased, from which we quote, as follows:

"This lot was originally scheduled to Fred E. Turner, but at the time of the service of notice of appraisement it was ascertained this lot was involved in litigation in the United States courts, the same being a part of the estate of John E. Turner, deceased. The matter has been settled and a mandate of the Court of Appeals of Indian Territory issued, giving Fred E. Turner a life interest in this property, the remainder to vest in the grandchildren of John E. Turner, mentioned in his will. I have examined this mandate and in view of its terms it could appear the lot should be scheduled to the estate, and title issued accordingly, leaving the matter of its distribution to be subject to the order of the court in the customary manner."

The record shows that Fred E. Turner knew, at the time he made the payment for lot 24, that lot 25 had been scheduled to the estate of John E. Turner, deceased, in accordance with the terms of the decree of the Court of Appeals; that he made no effort to make any payment for lot 25; that he permitted the executor of the estate of John E. Turner, deceased, to pay for lot 25; that he knew of the issuance of the patent for lot 25 to the heirs of John E. Turner, deceased, and that he made no objection thereto. It shows, further, that the heirs of John E. Turner, deceased, knew that Fred E. Turner made the payment for lot 24; that they permitted him to make the payment therefor; that they knew of the issuance of the patent therefor to him, and that they made no objection thereto. More than 30 years have elapsed since those transactions.

In this litigation Fred E. Turner contends that the execution of the patent to lot 25 to the heirs of John E. Turner, deceased, was erroneous and void; that those heirs hold the title thereto in trust for him; that he is the owner of all of the land involved in the action, together with the improvements thereon, and that the defendants have no right, title, or interest therein or thereto.

The defendants contend that Fred E. Turner has only a life estate in any of the property, and that the remainder over after that life estate is in certain of the defendants under the provisions of the last will and testament of John E. Turner, deceased, and by inheritance from the deceased devisees named therein.

The trial court found and decreed that the patent to lot 25 from the Creek Nation to the heirs of John E. Turner, deceased, was issued through a mistake of fact and law in that it should have been to Fred E. Turner for his lifetime with remainder over to the heirs of John E. Turner, deceased, and that otherwise the plaintiff should take nothing.

As to the claim of the defendants in their cross-petition, the trial court found and decreed that certain of the defendants therein named held the beneficial title to lots 24 and 25, with the two-story building thereon, subject to a life estate in Fred E. Turner. It quieted their title thereto. From that judgment, the plaintiff appealed to this court.

There is no material difference between the parties as to the facts, but they disagree as to the legal effect of the facts and the application of the law thereto.

Prior to the purchase by John E. Turner from C. B. Lynch and R. E. Lynch, the Congress had enacted what is known as the "Curtis Act" (30 Stat. L. 495), approved June 28, 1898, by which provision was made for the disposition of lots in Indian town sites under the supervision of what were designated "commissions." By the provisions of section 15 of that act, the commissions were directed to survey and lay out town sites; to appraise town lots at their true value, excluding improvements, and to make separate appraisements of the improvements. It was thereby provided that the owner of the improvements upon any town lot, other than fencing, tillage, or temporary buildings, might deposit in the United States treasury one-half of such appraised value of the lot, and that the deposit of the same should "be deemed a tender to the tribe of the purchase money for such lot." It was further provided that if the owner of such improvements failed to deposit the purchase money the lot might be sold in the manner provided for the sale of unimproved lots, and that the purchaser might proceed in court to condemn the improvements, the purchaser to deposit the determined value of the improvements with the clerk of the court, and the owner of the improvements to accept that amount in full payment therefor or remove the same from the lot. That was a recognition by the government, in so far as it had the power to do so, of a right of the owner of certain kinds of improvements in the lot upon which those improvements had been placed. He was authorized thereby to purchase such a lot at one-half of the appraised value thereof. Other purchasers were required to pay the appraised value thereof "unless ordered by the Secretary of the Interior."

Section 30 of that act ratified the agreement between the commission of the Creek Tribe of Indians and the commission to the Five Civilized Tribes that had been made on September 27, 1897, and it was made effective if ratified before the 1st day of December, 1898, by a majority of the votes cast by the members of that tribe at the election to be held for that purpose.

That agreement was not ratified by the Creek Tribe, but its ratification by the government was another recognition of the rights of the owner of improvements on lots in the lots. The extent of that recognition is shown by the provisions thereof. Under the provisions of paragraph numbered "15" of that agreement, when towns were laid out, each lot on which substantial and valuable improvements had been made was to be valued by the commission at the price a fee-simple title to the same would bring in the market at the time the valuation was made, "but not to include in such value the improvements thereon." Under the provisions of paragraph numbered "17" of that section:

"The owner of the improvements on any lot shall have the right to buy the same at 50 per centum of the value within 60 days from the date of notice served on him that such lot is for sale, and if he purchase the same he shall, within ten days from his purchase, pay into the treasury of the United States one-fourth of the purchase price and the balance in three equal annual payments, and when the entire sum is paid he shall be entitled to a patent for the same, to be made as herein provided for patents to allottees."

Under the provisions of paragraph numbered "19" of said section:

"If the owner of the improvements on any lot fail within 60 days to purchase and make the first payment on the same, such lot, with the improvements thereon (said lot and the improvements thereon having been theretofore properly appraised), shall be sold at public auction to the highest bidder, under the direction of said commission, at a price not less than the value of the lot and improvements, and the purchaser at such sale shall pay to the owner of the improvements the price for which said lot and the improvements thereon shall be sold, less 50 per centum of the said appraised value of the lot, and shall pay 50 per centum of said appraised value of the lot into the United States treasury, under regulations to be established by the Secretary of the Interior, in four installments, as hereinbefore provided. Said commission shall have the right to reject a bid on any lot and the improvements thereon which it may consider below the real value."

Under the provisions of paragraph numbered "21" of said section:

"All citizens or persons who have purchased the right of occupancy from parties in legal possession prior to the date of signing this agreement, holding lots or tracts of ground in towns, shall have the first right

to purchase said lots or tracts upon the same terms and conditions as is provided for improved lots, provided said lots or tracts shall have been theretofore properly appraised, as hereinbefore provided for improved lots."

By the provisions of paragraph numbered "15", supra, the lots were to be appraised without regard to the value of the improvements thereon. By the provisions of paragraph numbered '17", supra, the owner of the improvements on a lot was authorized to purchase the lot at 50 per centum of the appraised value thereof. By the provisions of paragraph numbered "19", supra, if the owner of the improvements on any lot failed to purchase it, a sale thereof was to be made at public auction at a price not less than the value of the lot and improvements, and the purchaser at such a sale was to pay to the owner of the improvements the price for which the lot and improvements thereon was sold, less 50 per centum of the appraised value of the lot. By the provisions of paragraph numbered "21", supra, any person who had purchased a right of occupancy from parties in legal possession prior to the signing of that agreement was authorized to purchase the lot upon the same terms and conditions as were provided for improved lots, that is, for one-half of their appraised value.

By those provisions there was a recognition by the government of an interest in the fee title to the lots in the owner of the substantial and valuable improvements thereon; a recognition by it of a right of any person who had purchased a right of occupancy from parties in legal possession of such a lot prior to the date of the signing of that agreement to purchase said lot or tract upon the same terms and conditions as were provided for improved lots, and an acknowledgment by it that the improvements on such a lot had not merged in the fee-simple title to the real estate.

See Arthur v. Coyne, 32 Okla. 527, 122 P. 688; Cochran v. Hocker, 34 Okla. 233, 124 P. 953; Turner v. Old Homestead Co., 68 Okla. 10, 170 P. 904; Turner v. Turner, 72 Okla. 256, 180 P. 248, and St. Louis & S. F. R. Co. v. Pfennighausen (Ind. Terr.) 104 S. W. 880. In Cochran v. Hocker, supra, this court discussed the purpose of the Curtis Act and said:

"The lands of the Creek Nation originally belonged to the nation as such, and not to the citizens thereof. They constituted the public domain of the tribe, and no member of the tribe owned any particular land, or any undivided interest therein, or any inheritable interest. They were held to a certain extent as the public domain of the United States is held. It belongs to the government. From this condition of affairs, it necessarily resulted that no citizens of the tribe could convey any right of property or possession in any land within the tribal limits. Towns and cities were built notwithstanding these conditions, because the inhabitants thereof (citizens of the United States and citizens of the tribe) were willing to take the chance upon treaties being made between the United States and the tribe, protecting these investments. The purpose of the acts referred to was in part to make possible the acquisition of title to town lots in the Indian Territory, and in so doing to recognize the rights of those who had erected improvements thereon, by giving them the right to purchase at one-half the appraised value. But these rights vested only in accordance with the terms of the treaties and upon the conditions thereby imposed. Under the Curtis Act, before the right vested, the town-site commission must be created. After its creation, it must survey the town and file the plats. After this, it must appraise the lots at their true value, excluding improvements. After this, the appraisement must be approved by the Secretary of the Interior. After this, the owner of the improvements has the option of purchasing at one-half of the appraised value, so that the preliminary steps amounted merely to an offer by the tribe and the government to the owner of the improvements, which he might accept, or not, as he chose."

We have called attention to those provisions of the Curtis Act, although, to some extent at least, they were superseded by an act of Congress commonly known as the "Original Creek Agreement" (31 Stat. L. 861), approved March 1, 1901, ratified by the Creek Nation on May 25, 1901. Turner v. Old Homestead Co. et al, supra; Turner v. Turner, supra.

At the time of the effective date of the Original Creek Agreement, John E. Turner was dead and the devisees named in his will had all of the rights in the property involved in this action which they acquired under the provisions of that will, as construed by the final decree of the Court of Appeals of the Indian Territory, and which, under the facts as they existed at that time, they could have under the provisions of the Curtis Act. After the effective date of the Original Creek Agreement they had such additional rights as were afforded them thereby.

By the provisions of paragraph numbered "11" of the Original Creek Agreement:

"Any person in rightful possession of any town lot having improvements thereon, other

than temporary buildings, fencing, and tillage, shall have the right to purchase such lot by paying one-half of the appraised value thereof, but if he shall fail within 60 days to purchase such lot and make the first payment thereon, as herein provided, the lot and improvements shall be sold at public auction to the highest bidder, under direction of the appraisement commission, at a price not less than their appraised value, and the purchaser shall pay the purchase price to the owner of the improvements, less the appraised value of the lot."

By the provisions of paragraph numbered "12" thereof it was provided that:

"Any person having the right of occupancy of a residence or business lot or both in any town, whether improved or not, and owning no other lot or land therein, shall have the right to purchase such lot by paying one-half of the appraised value thereof."

By the provisions of paragraph numbered "13" thereof it was provided that:

"Any person holding lands within a town occupied by him as a home, also any person who had at the time of signing this agreement purchased any lot, tract, or parcel of land from any person in legal possession at the time, shall have the right to purchase the lot embraced in same, by paying one-half of the appraised value thereof, not, however, exceeding four acres."

By the provisions of paragraph numbered "14" thereof it was provided that:

"All town lots not having thereon improvements, other than temporary buildings, fencing, and tillage, the sale or disposition of which is not herein otherwise specifically provided for, shall be sold within twelve months after their appraisement, under direction of the Secretary of the Interior, after due advertisement, at public auction to the highest bidder at not less than their appraised value.

"Any person having the right of occupancy of lands in any town which has been or may be laid out into town lots, to be sold at public auction as above, shall have the right to purchase one-fourth of all the lots into which such lands may have been divided at two-thirds of their appraised value."

By the provisions of paragraph numbered "11", supra, any person in rightful possession of any town lot having improvements thereon, other than temporary buildings, fencing, and tillage, was to have the right to purchase such lot by paying one-half of the appraised value thereof, and if such person did not purchase such lot, the lot with the improvements was to be sold at public auction to the highest bidder at a price not less than the appraised value thereof, and the

purchaser was to pay the purchase price to the owner of the improvements, less the appraised value of the lot. There are some distinctions between those provisions and the similar provisions contained in the Curtis Act, to which attention is directed. Under the provisions of the Curtis Act, the prior right of purchase was to the owner of the substantial and valuable improvements on any lot. Under the provisions of the Original Creek Agreement, the prior right of purchase was to "any person in rightful possession of any town lot having improvements thereon, other than temporary buildings, fencing, and tillage." Under the provisions of the Curtis Act, if the prior right afforded thereby was not exercised, the purchaser at public auction was to pay the purchase price, "less 50 per centum of said appraised value of the lot", to the owner of the substantial and valuable improvements thereon. Under the provisions of the Original Creek Agreement, if the prior right afforded thereby was not exercised, the purchaser at public auction was to pay "the purchase price" to the owner of the improvements, other than temporary buildings, fencing, and tillage, "less the appraised value of the lot."

A slightly different provision was made in paragraph 12, supra, as to persons having the right of occupancy of a residence or business lot, whether improved or not, where they owned no other lot or land therein. They were given a prior right to purchase the lot by paying "one-half of the appraised value thereof."

A slightly different provision was made by paragraph 13, supra, as to any person holding lands within any town occupied by him as a home and also as to any person who had, at the time of signing that agreement, purchased any lot, tract, or parcel of land from any person in legal possession at the time. They were given the right to purchase the land not exceeding four acres by paying one-half of the appraised value thereof.

Under the provisions of paragraph 14, supra, any person having the right of occupancy of lands in any such town not having thereon improvements, other than temporary buildings, fencing, and tillage, and the sale or disposition of which was not otherwise specifically provided for in that act, had the right to purchase one-fourth of all the lots into which such lands had been divided at two-thirds of their appraised value.

Thereby both the Creek Nation and the Congress recognized a right in any person in rightful possession of any town lot having

improvements thereon, other than temporary buildings, fencing, and tillage; in any person having the right of occupancy of a residence or business in any town, whether improved or not, and owning no other lot or land therein; in any person holding lands within a town occupied by him as a home; in any person who had, at the time of signing the agreement, purchased any lot, tract, or parcel of land from any person in legal possession at the time, and in any person having the right of occupancy of land in any town which had been or might be laid out into town lots, and that the improvements on such a lot had not merged in the fee.

In St. Louis & S. F. R. Co. v. Pfennighausen, supra, it was contended by the railroad company seeking to condemn land within the limits of the town site of Sapulpa that, inasmuch as the town site had not been subdivided into lots and blocks and the lots had not been appraised and scheduled at the time of the commencement of the proceedings, and inasmuch as the title was in the Creek Nation, the plaintiff therein was only entitled to the value of his improvements on the lot as his damages. The plaintiff therein contended that he was entitled to the value of his improvements and also the then present market value of his prospective interest in the land. It was agreed therein that an intermarried Creek citizen had been in possession of the land in controversy therein; that there were improvements thereon, and that he had sold and delivered his possessory rights by mesne conveyances to the plaintiff. We quote from that decision at length, as follows:

"Before the proceedings began, Sapulpa had been a town for 12 years—not in the legal sense, it is true, but an aggregation of people, which entitled them to all of the advantages of the Curtis Bill when enacted. Up to the time of the passage of that bill, as between these people and the Creek Nation, they were only squatters and trespassers, without any title, legal or equitable, to the land. But, as between themselves and others dealing with them in relation to the lands having full knowledge of the situation, the courts have always recognized their contracts relating to them. Walker Trading Co. v. Grady Trading Co., 1 Ind. T. 191, 39 S. W. 354. Among themselves they bought and sold town lots, executed mortgages upon them and leased them to tenants, and, as already said, the courts upheld their contracts; and thus it was that these early town builders, without title, established a market value for their possessory rights, whatever they may have been. But, when the Curtis Bill was passed, Congress, by that act, and the Creek Nation, by its agreement, recogniz-

ing that white men, by virtue of the fact that their money and their energy and industry in building the towns had greatly enhanced the value of the land, thereby creating some sort of an equity in their favor, enacted and agreed that the towns should be segregated and incorporated, and laid off into lots, and the lots, not including the improvements, should be appraised at their fee-simple value, and that the owner of the improvements should have the right to buy them, securing a fee-simple title, by paying one-half of the appraised value of the lot, the legal title to remain in the Creek Nation until the consideration was paid. Congress and the Creek Nation by this act and agreement declared and fixed the relative interests of the Creek Nation and the owner of the improvements on the lot as being equal, each one-half; and the fact that the title was to remain in the Creek Nation as security for the payment to it of its share by the owner of the improvement had no tendency to lessen the value of his half interest, nor was his interest so remote or uncertain that its value could not be ascertained. The Act of March 1, 1901, entitled, 'An act to ratify and confirm an agreement with the Muskogee or Creek Indians, and for other purposes' (31 Stat. 861, c. 676), as far as the contention in this case is concerned, is not materially different from the agreement contained in the Curtis Bill. Upon the enactment of these statutes, the citizens of Sapulpa in possession of improved town property were no longer squatters and trespassers, especially after the segregation of the land by surveying the limits of the town and its approval by the Secretary of the Interior. The statute made their possession a lawful and a valuable one, and it makes no difference whether payments had been made or not, or whether or not the right to or in the land was a vested one in the sense that the government and the Creek Nation might repeal the statute and abrogate the right. This contest is not between the government and the Creek Nation on the one side and the defendant in error on the other, but it is between the defendant in error and a company having no interest in the legislation and agreements, which were the foundation and the source of this valuable right to the possession and ultimately the ownership in fee of these lands.

"The contention that up to the time of the commencement of these proceedings there had been no payment made on the lot, and therefore defendant in error had no title or right which would entitle him to compensation in a condemnation suit, is not well founded. In the first place, it is not necessary that he should have owned the fee in the land. 'If the land is taken from one who owns less than the fee, he can recover for the diminished value of whatever interest he has, and that only.' 15 Enc. Law & Pr. 693, and cases cited. A settler on public lands who

has made a valid homestead entry and is in possession perfecting his title is entitled to the value of the injury done his possession. Ellisworth, etc., R. Co. v. Gates, 41 Kan. 574, 21 P. 632. But in this case there was something more than mere possession, with right to perfect title. The statute and the agreement granted this right on the theory that the money and labor expended in improving the lands within the town limits was equal to one-half of the value of the lands, and was the equivalent of a payment to that extent, and equitably at least they might be regarded as one-half owners, with the privilege of buying the other half at its appraised value. If the contention of the railway company be correct, in this case and all cases of this kind in the condemnation of land by railroad companies, the result would be that the one-half interest of the Creek Nation would be ascertained and paid, the value of the improvements would be paid to the occupant, and not only the prospective half interest of the occupant in the land would be cut off, but the half interest itself would be acquired by the company without compensation, simply because the company stepped in and took it before the time had arrived under the statute when the occupant of the land could make his payments and perfect his title; and thus all of the benefits intended by the statute to be conferred on the occupant in consideration of the expenditure of the money and labor he had made would go without consideration to the railroad company. The law does not tolerate such injustice. The defendant in error had a legal and a valuable interest in the land which could not be acquired by condemnation, or other proceedings, without compensation."

The Creek Nation scheduled lot 25 to the heirs of John E. Turner, deceased, and issued a patent therefor to them after the administrator of the estate of John E. Turner, deceased, had paid to it a sum equal to one-half of the appraised value of that lot. The legal title to the lot passed to them.

Fred E. Turner contends that there was a mistake of law and fact in the issuance of the patent to the heirs of John E. Turner, deceased, for the reason, as stated by him, that he was in the rightful possession of the lot and that a patent could be issued only to him under the law. That contention is an equitable one. If it is correct, the Creek Nation and the Congress provided that the owner of a life estate in the improvements on a Creek town site lot might acquire the title to the lot by paying the Creek Nation one-half of the appraised value of the lot, to the exclusion of the owners of the remainder over after that life estate in the building, and without paying them anything

for the value of their interest in the improvements. The Creek Nation owned the lots, and in every provision of the Curtis Act and in every other provision of the Original Creek Agreement provision was made for the protection of the rights of the owner of the improvements. There was no other provision by which the owner of the improvements was to be deprived of the value thereof.

We, therefore, hold that the language used in paragraph 11 of the Original Creek Agreement, "any person in rightful possession of any town lot", means the person in actual possession and the person, if any, in constructive possession by reason of his actual possession; that, as applied to the facts in this case, it means Fred E. Turner and the grandchildren of John E. Turner, deceased, named in his will, and that Fred E. Turner acquired no legal right, title, interest, or estate in or to lot 25 by virtue of the scheduling of that lot to the estate of John E. Turner, deceased, and the issuance and delivery of a patent therefor to the heirs of John E. Turner, deceased, save only as one of those heirs and to the extent of his interest in that estate.

The patent to lot 24 was to Fred E. Turner. While he was and is in possession of that lot, his possession thereof was and is for himself and the owners of the remainder over after his life estate. While he took the legal title by reason of the patent, he holds the equitable title in trust for the owners of the remainder over after his life estate. His possession has always been for himself and them. He admits that a court of equity may determine the equitable ownership by his action to have the equitable ownership of lot 25 determined. The plaintiff contends that the Court of Appeals of Indian Territory had no jurisdiction to change or to rewrite the will for the testator then deceased. He is not in a position to urge such a contention in a court of equity under the facts shown by the record in this case. That decree was rendered upon a stipulation of the parties thereto, of which he was one. The relationship which he assumed by reason of that stipulation and decree and his enjoyment of the fruits thereof for more than 30 years preclude him from asserting at this time in equity that he did not mean that to which he then agreed or that the decree of that court was void. Daniels v. Tearney, 102 U. S. 415, 26 L. Ed. 187; Davis v. Wakelee, 156 U. S. 680, 39 L. Ed. 578; Dismukes v. Halpern (Ark.) 1 S. W. 554;

Millington v. Hill (Ark.) 1 S. W. 547; Ferguson v. Landram (Ky.) 96 Am. Dec. 350; Kellar v. Stanley (Ky.) 5 S. W. 477; Hainer v. Iowa Legion of Honor (Iowa) 43 N. W. 185; Arthur v. Israel (Colo.) 25 P. 81; Bell v. Keepers (Kan.) 17 P. 785, and Folger v. Clark (Me.) 14 Atl. 9. That decree is binding upon the plaintiff, and under that decree the plaintiff has a life estate in the building and the remainder over after that life estate is in the defendants in this action.

There are many other contentions made in this case and many other decisions cited. We do not think it necessary to analyze them. Fred E. Turner went into possession of the building as a tenant of his father for life. Under the last will and testament of his father, as construed by the Court of Appeals of the Indian Territory, on his stipulation, he became the owner of that building for life with remainder over to the grandchildren named in the will and decree, whose rights passed to and now belong to the defendants in this case. He procured a patent to lot 24. He did so by reason of his being in the actual possession of that lot. While he was in the actual possession thereof, the grandchildren of John E. Turner, deceased, named in his will were in the constructive possession thereof and collectively they were in the rightful possession thereof. The heirs of John E. Turner, deceased, procured a patent to lot 25. They were in constructive possession thereof, though Fred E. Turner was in the actual possession thereof, and collectively they were in the rightful possession thereof. The record shows that those purchasers were for the joint interest of the devisees named in the will of John E. Turner, deceased, and that, under the provisions of that will, as construed by the Court of Appeals of the Indian Territory, the interest of Fred E. Turner therein was that of a life tenant, and the interest of the grandchildren named in the will of John E. Turner, deceased, was that of remainder over after that life estate.

The judgment of the trial court holding that Fred E. Turner is the owner of a life estate in and to the property involved in this action with remainder over to those defendants in this action found and determined by the decree of the trial court, is in all things affirmed.

CULLISON, V. C. J., and McNEILL, OSBORN, BAYLESS, BUSBY, and WELCH, JJ., concur. RILEY, C. J., and SWINDALL, J., absent.