2001 OK 111

**Gene H. FRANCIS and Mary Ann Francis, Plaintiffs/Appellants,**

v.

**Ira F. ROGERS, Susan K. Hendricks and Russell Rogers, and the Heirs, Executors, Administrators, Devisees, Trustees and Assigns of Lucille Rogers, deceased and the Unknown Successors of Lucille Rogers, deceased, Defendants/Appellees.**

**No. 94,607.**

Supreme Court of Oklahoma.

Dec. 4, 2001.

---

**53.** Title *12 O.S.1991 § 2201,* see note 4, supra; *Davis v. GHS Health Maintenance Organ., Inc.,*   see note 3, supra.

Richard A. Williams, Anadarko, OK, for Plaintiffs/Appellants.

Thomas R. Zynda, Anadarko, OK, for Defendants/Appellees.

KAUGER, J.:

¶ 1 The dispositive issue presented is whether the evidence supports the trial court's determination regarding title to the property on which the railroad right of way was located. It does not.

## FACTS

¶ 2 This cause concerns a dispute over land on which a railroad once held a right of way. The dispositive issue involves the location of the boundary line between the adjoining landowners. Elbert C. Hedrick, and his wife Jessie Hedrick, and Vernon Hedrick and his wife Hazel Hedrick, (collectively, the Hedricks) owned land located in rural Caddo County, Oklahoma. A railroad right of way held by the Chicago Rock Island & Pacific Railroad and Railway Company ran north and south through the Hedricks' property, dissecting it into east and west tracts.[1]

¶ 3 In 1962, the Hedricks sold the west tract to the defendants/appellees, Ira F. Rogers and his wife Lucille Rogers,[2] (collectively, the Rogers). The Rogers' deed described the property as "lying and situated West of the westerly line of the . . . [railroad] right-of-way."[3] According to the testimony of the Rogers' son, sometime in 1963, the Rogers and the Hedricks constructed a permanent fence some distance east of the east side of the railroad right of way. The purported purpose of this fence was, contrary to the language of the Rogers' deed, to create a boundary line between the Rogers' property and the Hedricks' property.

¶ 4 The east tract of the Hedricks' property remained in the Hedricks family until 1990, when surviving Hedricks family members sold it to the plaintiff/appellants, Gene H. Francis and his wife Mary Ann Francis, (collectively, the Francises). The Francises took the property from surviving Hedricks family members by two deeds—a warranty deed[4] and a guardian's deed.[5]

1. It is undisputed that the interest the railroad held in the land was in the nature of an easement.

2. Lucille Rogers died in 1993, before this cause was filed. Ira Rogers was alive when the lawsuit was filed, but died shortly before the cause went to trial. The remaining defendants/appellants are the Rogers' two children, Russell Rogers and Susan K. Hendricks.

3. The deed described the property as:
   "All that part of Lots Four (4), Five (5), and (6), in the Southeast Quarter, and the Southwest Quarter of the Southeast Quarter of Section Fourteen (14), in Township Seven (7), North, of Range Eleven (11), West I.M., lying and situated **West of the westerly line** of the Chicago, Rock Island and Pacific R.R. right-of-way, containing 83.6 acres, more or less . . ." (Emphasis supplied.)

4. The warranty deed described the property as:
   "Lots One (1), Two (2), Three (3) and Four (4) in Section Thirteen (13) and portions of Lots Four (4), Five (5) and Six (6) and the SW/4 of the SE/4 in Section Fourteen (14), Township Seven (7) North, Range Eleven (11) West of I.M., containing 156.44 acres more or less . . ."

5. The guardian's deed described the property as:
   "An undivided one-sixth (⅙) interest in and to Lots One (1), Two (2), Three (3) and Four (4) in the Southwest Quarter (SW/4) of Section Thirteen (13), and that part of Lots Four (4), Five (5) and Six (6) in the Southwest Quarter of the Southeast Quarter (SW/4 SE/4) of Section Fourteen (14), lying and situated East of the C.R.I. & P.R.R. right of way, all in Township Seven (7) North, Range Eleven (11) West, I.M., Caddo County, Oklahoma."

¶ 5 The railroad stopped running trains on the right of way in the early 1980's. In October of 1985, the railroad attempted to convey its interest in the property through a quit claim deed to a third party, abandoning its right of way and reserving a temporary easement until December of 1986.[6] Sometime after the Francises purchased their property in 1990, Gene Francis approached the Rogers about dividing the strip of land on which the railroad had held its right of way. The Rogers refused and the Francises filed suit on July 3, 1996.

¶ 6 The Rogers answered the petition and cross-petitioned, seeking a determination that the fence, rather than the railroad right of way, constituted the boundary line between the two tracts of property and that they owned the disputed property. They asserted that: 1) the fence, constructed in approximately 1962, was intended to serve as the boundary line between the east and west tracts of land; 2) they had conducted farming and grazing activities west of the fence since 1962 and had openly, notoriously, and adversely to the Francises and their predecessors in title possessed the property west of the fence; and 3) at the time the railroad abandoned its right of way, they had openly, notoriously, and adversely possessed the disputed property for approximately twenty years and upon abandonment of the right of way, it reverted to them as they were adjoining or abutting landowners.

¶ 7 On March 10, 2000, the trial court, Honorable Richard G. Van Dyck, entered an order quieting title to the Rogers. It found that: 1) the Rogers received title to the property west of the railroad right of way in 1962 and in 1963, they erected a fence some distance outside of the east side of the railroad right of way; 2) the fence was intended to serve as the boundary line between the Rogers' and the Francises' properties; and 3) since 1963, the Rogers have adversely possessed a narrow strip of land between the east side of the railroad right of way and the boundary line fence.

¶ 8 The trial court determined that because the Rogers, by adverse possession, owned a narrow strip of land east of the right of way they were the adjoining land owners to the east and to the west of the right of way. Consequently, when the railroad abandoned the right of way, it passed to the Rogers as adjoining landowners. The Francises appealed. The Court of Civil Appeals affirmed. We granted certiorari on June 7, 2001.

¶ 9 **THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE TRIAL COURT'S DETERMINATION REGARDING THE DISPUTED PROPERTY.**

¶ 10 The Rogers argue that the trial court properly determined that they owned the

---

6. The question of abandonment of a right of way by a railroad is a question of fact. *Orth v. Gregory*, 1924 OK 36, ¶——, 223 P. 385. To constitute abandonment of railroad right of way there must not only be an actual relinquishment but an intention to abandon. *Kansas, O. & G. Ry. Co. v. Rogers*, 1947 OK 235, ¶ 7, 191 P.2d 209; *Santa Fe L. & E.R. Co. v. Wichita Falls & N.W. Ry. Co.*, 1917 OK 299, 166 P. 168. The question of whether a right of way has been abandoned is largely a question of intent. *Midwestern Developments, Inc. v. City of Tulsa*, 259 F.Supp. 554, 558 (D.C.Okla.1966). The trial court determined that the railroad abandoned its right of way in 1986. Neither party disputes this finding. In 1995, the railroad apparently attempted to convey its interest, in the form of a quit claim deed to a grantee by the name of Brewer and Taylor Co., Ltd. Partnership of Holdenville, Oklahoma. Brewer and Taylor Co. is not a party to this lawsuit, nor was evidence presented to reflect whether it asserts any interest in the property. The only explanation in the record of Brewer and Taylor is when the plaintiff's lawyer entered the quit claim deed into evidence. The trial transcript provides in pertinent part at p.p. 11–12:

"Your Honor, at this time, then, I will also offer into evidence Plaintiffs' Exhibit G, which again is a certified copy of a quit claim deed from Chicago Pacific Corporation to a company called Brewer and Taylor Company of Holdenville, Oklahoma.

It's dated October 24th of '85 and this is a copy of the deed whereby the railroad attempted to give, I think, we believe at least possessory interest in the easement in question to Brewer and Taylor for purposes of removing tracts and other items relative to the railroad's right of way. . . .

. . . I wish to bring the Court's specific attention to a statement on page 116 of the railroad whereby it states that they intended to reserve a right of way easement until December 31st, 1986."

property on which the railroad right of way was located. They contend that they owned a narrow strip of property some distance outside of the right of way between the fence and the east side of the right of way by adverse possession and consequently owned the right of way property as adjoining or abutting landowners. Alternatively, they insist that the fence erected on the east side of the right of way was intended to be the boundary line between the properties. The Francises assert that the evidence does not support the trial court's findings and its decision is contrary to law.[7]

## A.

### The Evidence was Insufficient to Establish Title to the Narrow Strip of Land East of the Railroad Right of Way by Adverse Possession.

¶ 11 We note at the outset that testimony at trial regarding the location of the fence dividing the properties was conflicting.[8]

7. On certiorari, the Francises characterize this cause as a dispute over whether the Rogers obtained title to the abandoned railroad right of way through adverse possession. However, the Rogers did not contend that they adversely possessed the railroad right of way, nor did the trial court make such a determination. Here, the Rogers contend that they own the right of way property either as adverse possessors of a narrow strip of property some distance outside of the right of way between the fence and the east side of the right of way making them adjoining or abutting landowners to the right of way property or because the fence erected on the east side of the right of way was intended to be the boundary line between the properties.

The trial transcript provides in pertinent part on page 163:
"... Now, it is true, as far as adverse possession, that you can't adversely possess a railroad right of way, Okay? I mean, I'm not disputing that...."
The trial transcript provides in pertinent part on page 164:
"... if I adversely possess and own this property right here, when that railroad is abandoned, that railroad right of way goes in equal share to the adjoining or abutting landowners, and there is no question on this side who the adjoining or abutting landowner is, and there's no question in my opinion, on this side, because if Rogers and Hendricks owned this property right here by adverse possession, then it comes to them on this side and it comes to them on that side...."

No legal description of the right of way or survey of the properties was presented to the trial court. The trial court did not determine the width of the right of way or the distance between the track and the east fence. Nor did it determine the specific date on which the Rogers ultimately claimed title by adverse possession. However, it did find that the Rogers adversely possessed a narrow stip of land some distance outside of and east of the right of way for more than fifteen years prior to the railroad's abandonment of its right of way in 1986.

¶ 12 In adverse possession cases, the appellate courts will weigh evidence presented, but will not reverse the trial court's judgment unless it is against the clear weight of evidence.[9] To establish adverse possession the claimant must show that possession was hostile, under a claim of right or color of title, actual, open, notorious, exclusive, and continuous for the full statutory period.[10] The statutory period for title by prescription is fifteen years.[11]

8. The Francises testified that, at one time, there were permanent fences located on both sides of the 200 foot wide right of way intended to keep cattle off of the tracks. The Rogers asserted that: 1) the right of way was only 100 feet wide; 2) the only fence that ever existed on the west side of the right of way was an occasional electric fence to keep cattle off the tracks; 3) the fence on the east side of the right of way was approximately 110 feet from the south end of the track and 140 feet from the north end of the track; and 4) the fence was intended to be the boundary line between the two properties.

9. Krosmico v. Pettit, 1998 OK 90, ¶ 23, 968 P.2d 345; Shanks v. Collins, 1989 OK 115, ¶ 16, 782 P.2d 1352; Carson v. Keith, 1967 OK 206, ¶ 11, 433 P.2d 956.

10. Krosmico v. Pettit, see note 9, supra, at ¶ 15; Shanks v. Collins, see note 9, supra at ¶ 14; Norman v. Smedley, 1961 OK 143, ¶ 22, 363 P.2d 839.

11. Title 12 O.S.1991 § 93 provides in pertinent part:
"Actions for the recovery of real property, or for the determination of any adverse right or interest therein, can only be brought within the periods hereinafter prescribed, after the cause of action shall have accrued, and at no other time thereafter:
...
(4) An action for the recovery of real property not hereinbefore provided for, within fifteen (15) years."

¶ 13 Furthermore, possession must be open, visible, continuous, and exclusive, with a claim of ownership that notifies persons seeking information upon the subject that the premises are not held in subordination to any title or claim of others, but against all titles or claimants.[12] Acquisition by prescription is disfavored, and not to be made out by inference.[13] The party claiming title adversely has the burden of proving every element by clear and positive proof.[14] In questionable cases, presumptions favor the record title holder.[15]

¶ 14 Although testimony regarding the year in which the trains quit running was disputed, the trial court determined that the railroad did not abandon its right of way until 1986. Consequently, to establish adverse possession, the Rogers had to show clearly and positively that they had open, notorious, hostile and exclusive possession of the narrow strip of land in controversy for an uninterrupted and continuous period of fifteen years.

¶ 15 At trial, the Rogers argued that they possessed and occupied the strip of land by farming it and running cattle on it from the time the fence was erected in 1962. In support of their argument, they relied upon the testimony of three witnesses—their son, their daughter and her husband. The Rogers' son testified that: after the east fence was constructed in 1963, the Hedrick's never indicated a right to use, occupy or possess any of the property west of the east fence; there was no permanent fence west of the right of way; his family, with permission of the railroad, installed a pipe under the railroad track in the late 60's to irrigate from the river; and they possessed and occupied the area by farming and running cattle on it. Nevertheless, he admitted that when the

property was first purchased, there were remnants of a fence on their side of the right of way and that they put up an electric fence along the railroad track when they had cattle on their property to keep them off of the track. He also admitted that the right of way and railroad bed was not cultivable and that cattle grazed on the property only after the railroad stopped running trains in or around 1980.

¶ 16 The Rogers' daughter testified that she had no knowledge of the Hedricks ever using, possessing or occupying the property west of the east fence, and that there was never a permanent fence west of the railroad right of way. She also testified that after the trains quit running in about 1980, her family fenced across the railroad tracks and connected to the east fence. Subsequently, they occasionally ran cattle in the area and in 1988, they also began leasing all of the property west of the east fence to third parties for cattle grazing. Her husband provided essentially the same testimony, but admitted that the railroad right of way was not cultivable.

¶ 17 There was no direct evidence to show that the Rogers met the requirements of adverse possession to the narrow strip of land between the east side of the railroad right of way by the time the railroad abandoned its right of way in 1986. The only evidence presented in the trial court as to the nature of the Rogers' claim was their testimony that they possessed and occupied the land by farming and grazing cattle on it. However, it was uncontroverted that the land was not cultivable and they admitted to occupying the property and grazing cattle on it only after the trains quit running on the right of way which at the earliest was, according to them, in 1980—only six years

Title *60 O.S.1991 § 333* provides:
"Occupancy for the period prescribed by civil procedure, or any law of this state as sufficient to bar an action for the recovery of the property, confers a title thereto, denominated a title by prescription, which is sufficient against all."

12. *Willis v. Holley,* 1996 OK 107, ¶ 6, 925 P.2d 539; *Sears v. State Dept. of Wildlife Conservation,* 1976 OK 56, ¶ 13, 549 P.2d 1211; *Sudheimer v. Cheatham,* 1968 OK 99, ¶ 8, 443 P.2d 951.

13. *Willis v. Holley,* see note 12, supra at ¶ 5; *Sudheimer v. Cheatham,* see note 12, supra at ¶ 7; *Hassell v. Texaco, Inc.,* 1962 OK 136, ¶ 13, 372 P.2d 233.

14. *Willis v. Holley,* see note 12, supra; *Norman v. Smedley,* see note 10, surpa; *Sudheimer v. Cheatham,* see note 12, supra.

15. *Willis v. Holley,* see note 12, supra; *Shanks v. Collins,* see note 9, surpa; *Tindle v. Linville,* 1973 OK 64, ¶ 8, 512 P.2d 176.

prior to the railroad's abandonment of its right of way. The Rogers' evidence when taken as a whole, does not clearly and positively show that they had open, notorious, hostile, and exclusive possession of the narrow strip of land in controversy for an uninterrupted and continuous period of fifteen years by the time the railroad abandoned its right of way in 1986, and the strip of land reverted to the property owners.[16] Accordingly, the trial court's determination regarding adverse possession was based on insufficient evidence to establish title to the narrow strip of land east of the railroad right of way through adverse possession.

## B.

### The Trial Court's Determination that the Fence was Intended to Act as a Boundary Line is Not Supported by the Evidence.

¶ 18 The Rogers alternatively assert that even if they do not own the disputed property by adverse possession, the east fence was intended to be the boundary line between the two properties pursuant to a parol agreement with the Hedricks in 1963. They argue that a parol agreement is evidenced by: 1) the testimony of the witnesses; 2) the fact that there was not a fence on the west side of the railroad right of way; and 3) the fence line was acquiesced from 1963 when the fence was constructed until this action was filed. The Rogers also insist that

pursuant to *Lake, for Use and Benefit of Benton v. Crosser,* 1950 OK 49, 216 P.2d 583, when a parol agreement to change the boundary line between properties exists, occupation of the property for the prescriptive period is not necessary.[17] The Francises counter that the fence was located east of the right of way, but not outside of the right of way, and that it existed, just as a fence once existed on the west side of the right of way, to keep cattle off of the right of way. They argue that the evidence does not support a finding that the east fence was intended to be a new boundary line between the properties.

¶ 19 In *Lake for Use and Benefit of Benton v. Crosser,* supra, the court recognized that boundary by agreement generally occurs when the exact location of a boundary line is unknown and the adjoining landowners mutually agree by parol agreement on the location of their boundary line though it may vary from the description in their conveyances. In *Lake,* a five acre tract was carved out of the corner of a forty acre tract and conveyed in 1929. The five acre tract was bounded on two sides by public roads and the other two sides were unmarked. After the conveyance, the adjoining landowners, rather than having the property surveyed, agreed to jointly measure the property and erect fences to serve as the boundary lines between the forty acre tract and the five acre tract. There was a dispute about where to

16. *See e.g., Norman v. Smedley,* note, 10, supra; *Colson v. Hall,* 1952 OK 155, 246 P.2d 339.

17. In determining whether a fence marks the boundary between the adjoining landowners, two governing principles typically apply those applicable to the doctrines of boundary by acquiescence or boundary by agreement. Boundary by acquiescence generally occurs when adjoining landowners occupy their premises up to a certain line which they mutually recognize and acquiesce in as a boundary for the time period prescribed by title by prescription, and they are precluded from claiming that the boundary is not the true one. In such cases, while one or both of the landowners may not have participated in the establishment or marking of the boundary and the element of an actual agreement is missing, acquiescence is inferred from the acts of adjoining landowners. See, e.g., *Comstock v. Little,* 1961 OK 35, ¶ 0, 359 P.2d 704; *Holt v. Hutcheson,* 1958 OK 299, ¶ 3, 333 P.2d 530; *Cornelison*

*v. Flanagan,* 1947 OK 159, ¶ 5, 180 P.2d 823; *Lewis v. Smith,* 1940 OK 276, ¶ 9, 103 P.2d 512; *Midland Valley R. Co. v. Imler,* 1927 OK 435, ¶ 0, 262 P. 1067, *cert. denied,* 277 U.S. 591, 48 S.Ct. 528, 72 L.Ed. 1003 (1928). See generally, Annot. "Establishment of Boundary Line by Oral Agreement or Acquiescence," 69 A.L.R. 1430 (1930), supplemented at 113 A.L.R. 421 (1938). It appears that the gravamen of the Rogers argument is that there was an actual parol agreement to establish the fence as boundary line. Nevertheless, the Rogers' claim would fail under the doctrine of acquiescence for the same reasons their claim for adverse possession fails it was uncontroverted that the land was not cultivable and they admitted to occupying the property and grazing cattle on it only after the trains quit running on the right of way which at the earliest was, according to them, in 1980 only six years prior to the railroad's abandonment of its right of way.

begin measurement, but it was resolved and they erected the fences.

¶ 20 Subsequently the five acre tract was conveyed twice and in 1942, the property was surveyed which revealed that the fences were twenty eight feet inside the true property line of the forty acre tract. A quiet title action was brought just four days short of fifteen years after the date of the 1929 deed. The court held that when adjoining landowners, enter into a parol agreement, long acquiesced in, which was an honest attempt to fix a true boundary and they mark the line agreed upon by building a fence and they actually occupy their properties up to the line for a long period of time, the boundary will be held good although the time has not been sufficient to establish prescriptive title.

¶ 21 Here, there is no direct evidence of a mutual parol agreement.[18] The Rogers' son testified that he was present when the fence was constructed by his family and the Hedricks in 1963.[19] He character-

ized the fence as a fence to keep cattle off of the right of way and to serve as a the boundary line between the two properties. Nevertheless, he admitted that he knew nothing of the intentions or any agreement of the property owners to mutually recognize that the fence would serve as a boundary line between the two properties.[20] The 1962 deed clearly describes that the true boundary of the Rogers' property as west of the westerly line of the railroad right of way. No evidence was presented of an attempt to settle the boundary by the erection of a fence, or that the location of the true boundary was unknown.[21]

¶ 22 The clear weight of the evidence does not establish that the disputed property was actually occupied for a long period of time. The Rogers testified that: after the east fence was constructed, the Hedricks never indicated a right to use, occupy, or possess any of the property west of the east fence; the Rogers did not have any knowledge of the Hedricks use of the disputed property;

---

**18.** The Rogers point to a trust agreement and quit claim deed executed by them in 1995, and one of the Hedricks' quit claim deeds executed in 1990, as evidence that the fence was intended to be the boundary line between the properties. This argument is unconvincing because both of the Rogers' documents were executed in 1995, just before this lawsuit was filed and they merely omit any reference to the westerly line of the railroad right of way. They describe the property as:

> "Lots four (4), Five (5), and Six (6) in the Southeast Quarter (SE/4), and the Southwest Quarter (SW/4 SE/4) of Section Fourteen (14), Township Seven (7) North, Range Eleven (11) West, I.M., Caddo County, Oklahoma . . ."

The guardian's quit claim deed executed in 1990, see note 5, supra, represents one of the Hedricks who owned an interest in the property and it appears to refer to the right of way as dividing the two properties but it does not identify the fence as the boundary nor does it describe the property as east of the easterly line of the right of way like the 1962 deed.

**19.** One of the Hedricks was apparently Ira Roger's uncle.

**20.** The trial transcript at page 104 provides in pertinent part:

> "... Q: All right. Well, let me ask you this. Were there any other conveyances of property that you know of between Mr. Hedrick and the

Rogers, Mr. and Mrs. Rogers, which would have conveyed this 19 acres of property east of the west line that you've already described as what they received the year before which would show of record an intention on the part of Mr. Hedrick to give them that 19 acres in that right of way. Is there anything that you know of such as that?
> A: Not that I'm aware of.
> Q: And so when you-you characterized that fence that runs along the east side of the right of way as a boundary fence, that's just your interpretation, is that correct?
> A: That's correct.
> Q: And there's nothing else that would indicate that it was the mutual intention on everybody's part that was, quote, a 'boundary fence.'
> A: I never really heard it discussed. . . ."

**21.** *Lake, for Use and Benefit of Benton v. Crosser,* 1950 OK 49, ¶ 9, 216 P.2d 583 When there is doubt, uncertainty, a dispute as to the true location of a boundary line, or the exact location of the boundary line is unknown, the adjoining landowners may by parol agreement establish a division line. Such a line simply serves to fix the true location of the line rather than passing title to real estate in contravention of the statute of frauds. *Rocher v. Williams,* 1938 OK 376, ¶ 15, 80 P.2d 649; *Patterson v. Meyer,* 1910 OK 355, 114 P. 256. See generally, A. Stephens, Annot. "Sufficiency of Showing, in Establishing Boundary by Parol Agreement, that Boundary was Uncertain or in Dispute Before Agreement," 72 A.L.R.4th 132 (1989); J. Pearson, Annot.

and there was never a permanent fence west of the right of way. However, the Rogers admitted to occupying the property and grazing cattle on the property only after the trains quit running on the right of way which at the earliest was, according to them, in 1980, when they fenced across the right of way. Additionally, the Roger's son admitted that when the property was first purchased, there were remnants of a fence on their side of the right of way and that they put up an electric fence along the railroad track when they had cattle on their property to keep them off of the track.

¶ 23 In contrast to the Rogers' evidence, the great-grandson of one of the Hedricks testified that: at one time, there were fences on both sides of the right of way to keep cattle off of the tracks; the Hedricks family considered the west fence to be the boundary line to the Rodgers' property; and the Hedricks family hunted on the right of way between the two fences. The daughter of one of the Hedricks testified that her father considered the right of way his, and that he intentionally sold only the property west of the right of way to the Rogers because he thought he might some day need the right of way to access property which he was thinking about purchasing after the railroad abandoned its right of way. She also testified there were fences on both sides of the right of way and that she did not believe the Rogers ever used the right of way.

¶ 24 Gene Francis, who farmed for the Hedricks several years before purchasing the east tract, insisted that there were fences on both sides of the right of way, but that the west fence had washed out in a flood and was never replaced. He also agreed that people hunted quail on the right of way, but admitted that until he filed this lawsuit, he did not know who owned the right of way property.

He testified that the Rogers did not fence over the right of way in 1980, but that it was several years later before they began using the right of way property.

¶ 25 After a through review of the record, we are convinced that the Rogers did not present sufficient evidence to establish that there was a parol agreement which was an honest attempt to fix the true boundary as marked by the fence or that they actually occupied the property up to the line for a long period of time as required by *Lake for Use and Benefit of Benton v. Crosser*, 1950 OK 49, 216 P.2d 583. Considering the evidence as a whole, there is no evidence to indicate that the east fence was anything more than a fence intended to keep cattle off of the right of way. Accordingly, the trial court's determination that the east fence was intended to act as a boundary line between the two tracts of land is not supported by the evidence.[22]

## CONCLUSION

¶ 26 In adverse possession cases, the appellate courts will weigh evidence presented, but will not reverse the trial court's judgment unless it is against the clear weight of evidence.[23] The party claiming title adversely has the burden of proving every element by clear and positive proof.[24] The evidence when taken as a whole, did not clearly and positively show that the Rogers' had open, notorious, hostile and exclusive possession of the narrow strip of land in controversy for an uninterrupted and continuous period of fifteen years by the time the railroad abandoned the right of way in 1986. While adjoining landowners can, under certain circumstances, mark the boundary between their properties by a fence to act as a boundary line contrary to a conveyance, the evi-

"Fence as Factor in Fixing Location of Boundary Line–Modern Cases," 7 A.L.R.4th 53 (1981).

22. When the pleadings invoke the equitable cognizance of the trial court to quiet title, this Court will not reverse the judgment unless it is against the clear weight of the evidence. *Krosmico v. Pettit*, see note 9, supra; *Shanks v. Collins*, see note 9, supra; *Carson v. Keith*, see note 9, supra. The determination of a boundary dispute is a matter of equitable cognizance and will not be

reversed unless it is against the clear weight of the evidence. *Schoenecke v. Yost*, 1989 OK 39, ¶ 12, 776 P.2d 1262.

23. *Krosmico v. Pettit*, see note 9, supra; *Shanks v. Collins*, see note 9, supra; *Carson v. Keith*, see note 9, supra.

24. *Willis v. Holley*, see note 12, supra; *Norman v. Smedley*, see note 10, surpa; *Sudheimer v. Cheatham*, see note 12, supra.

dence is insufficient to indicate that the east fence was intended to act as a boundary line.

¶ 27 In *Hill v. Cunningham*, 1958 OK 189, 329 P.2d 1034, the Court recognized that ordinarily, if an original landowner neglects to retain any portion of a railroad right of way before conveying the land on either side of it, the abutting land owners would split the right of way property. However, the *Hill* court held that the general rule does not apply when the original landowner conveys only that portion of the land to one side of the right of way and retains the rest of the property, which would include the area burdened by the right of way. Consequently, the cause is reversed and remanded and the trial court is directed to enter judgment quieting title in favor of the Francises.

## COURT OF CIVIL APPEALS OPINION VACATED; TRIAL COURT REVERSED AND REMANDED WITH INSTRUCTIONS.

¶ 28 WATT, V.C.J., HODGES, LAVENDER, KAUGER, SUMMERS, BOUDREAU and WINCHESTER, JJ. concur.

¶ 29 HARGRAVE, C.J. and OPALA, J. dissent.

OPALA, J., with whom HARGRAVE, C.J., joins, dissenting.

¶ 1 The court holds today that there is an absence of proof to support the trial judge's decree in favor of the defendants. It orders that on remand a decree be entered in favor of the plaintiffs. I dissent for the reasons to be explained.

¶ 2 Ordinarily in a quiet-title suit, a party must recover on the strength of its own title rather than on the weakness of that held by its adversary. *Atlantic Richfield Co. v. State*, 1983 OK 14, ¶ 12, 659 P.2d 930, 934–35 n. 11. In a case of equitable cognizance, an appellate court may re-weigh the evidence, but *must not* reverse the chancellor's findings unless they are clearly contrary to the weight of the evidence. *In re T.H.L.*, 1981 OK 103, ¶ 7, 636 P.2d 330, 332–33. On so re-weighing the *entire* proof, the appellate court may render that decree which the trial court *should* have rendered.

¶ 3 In this quiet-title suit there were two claims—that by the plaintiffs and that (pressed by counterclaim) of the defendants. The court's opinion finds insufficient evidence to support the defendants' nisi prius decree in defendants' favor but says nothing about the strength of the plaintiffs' *own claim* to title.

¶ 4 I agree with the court's opinion to the extent it finds that the plaintiffs should be deemed to have defeated the defendant's counterclaim. There is no evidentiary support for defendants' adverse possession or for a boundary by agreement that would favor their claim. Also *absent is proof* to support the *plaintiffs' own claim to title.* In short, giving victory to the plaintiffs is unwarranted. This is so because their evidence falls short of establishing their own claim.

¶ 5 Because *in a post-remand retrial both parties may be able to secure proof sufficient to support their respective claims*, I would remand this cause with directions to afford them a new trial. Whenever an appellate court is of the view that *other* evidence *may* be produced on remand (or is unable to say that such evidence may not be secured), it will not direct that the suit be terminated by judgment but rather will order the cause (in which nisi prius decree stands reversed) to be remanded for new trial. *Guinn v. Church of Christ of Collinsville*, 1989 OK 8, ¶ 22, 775 P.2d 766, 775; *Sherrill v. Sovereign Camp, W.O.W.*, 1938 OK 549, ¶¶ 12, 13, 86 P.2d 295, 296.