2012 OK CIV APP 82

**WRT REALTY, INC., an Oklahoma corporation, Plaintiff/Appellee,**

v.

**BOSTON INVESTMENT GROUP II, L.L.C., Defendant/Appellant,**

and

**David Sharp, Defendant.**

No. 109,479.

Court of Civil Appeals of Oklahoma, Division No. 2.

July 31, 2012.

---

1. Appellee's Answer Brief included a motion to dismiss this appeal. That motion is denied.

H. Gregory Maddux, Maddux & Maddux, Tulsa, Oklahoma, for Plaintiff/Appellee.

Stephanie L. Theban, Riggs, Abney, Neal, Turpen, Orbison & Lewis, P.C., Tulsa, Oklahoma, for Defendant/Appellant.

JOHN F. FISCHER, Chief Judge.

¶1 WRT Realty, Inc. filed suit to determine the ownership of property between land it owned and land owned by Boston Investment Group II, LLC. Both parties sought summary adjudication of the issue. The district court found that WRT was the owner of the Disputed Property. Boston appeals the district court's order granting WRT's motion for summary judgment and denying Boston's cross-motion for summary judgment. The appeal has been assigned to the accelerated docket pursuant to Oklahoma Supreme Court Rule 1.36(b), 12 O.S.2011, ch. 15, app. 1, and the matter stands submitted without appellate briefing. Because it cannot be determined on the basis of this summary judgment record whether WRT acquired title to the Disputed Property by adverse possession, the judgment of the district court is affirmed in part, reversed in part, and this case is remanded for further proceedings as directed in this Opinion.

## BACKGROUND

¶2 This dispute involves ownership of a portion of Lot 1, Block 6 of the Original Town of Tulsa, Oklahoma.[1] At the time the town site was platted, the property was covered by a sixty-foot roadway easement designated as North 4th Street and later as Davenport Street. Boston and WRT owned property abutting at the centerline of Davenport. The specific dispute concerns a twenty-foot strip of land on the south end of Boston's property north of this centerline. In 1902, Tulsa vacated a portion of Davenport including the Disputed Property. The City took this action so that a railroad could be established. A railroad easement was acquired over the Disputed Property and used until the late 1970's or early 1980's. At least as early as 1984, someone, presumably one of WRT's predecessors in interest, erected a fence approximately twenty feet north

of the legal boundary between the WRT and Boston properties. WRT acquired its interest in the property in 1992. Boston acquired its interest in the abutting property in 2001. Both parties sold their interest to the same buyer in 2008. WRT claims it acquired the Disputed Property by adverse possession, and is therefore entitled to the proceeds from the sale of that property.

## STANDARD OF REVIEW

¶3 Title 12 O.S.2011 § 2056 governs the procedure for summary judgment; a motion for summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must, by affidavits or as otherwise provided in this rule, set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

*Id.* We review the district court's grant of summary judgment *de novo. Carmichael v. Beller*, 1996 OK 48, ¶2, 914 P.2d 1051, 1053.

## ANALYSIS

¶4 WRT's motion for summary judgment asserts title to the Disputed Property by adverse possession, or in the alternative, pursuant to the doctrine of border by acquiescence. Boston's response and cross-motion for summary judgment argues that WRT could not have acquired title to the Disputed Property by adverse possession because, according to Boston, Davenport was City property until 2008 when the City's right to re-open Davenport was foreclosed. The parties' motions are predicated on a Joint Stipulation of Uncontested Facts covering many of the material facts in this dispute. There are also

---

1. The terms "Town," "City" and "Tulsa" are used interchangeably to refer to this entity and its successors.

facts derived from the uncontroverted statements and points of agreement in the parties' pleadings, motions and summary judgment briefs. Factual admissions in a brief may supplement the record. *Tyler v. Shelter Mut. Ins. Co.*, 2008 OK 9, n. 9, 184 P.3d 496; *State ex rel. Macy v. Bd. of County Comm'rs*, 1999 OK 53, n. 8, 986 P.2d 1130.

## I. Undisputed Facts

¶ 5 The Disputed Property consists of a twenty foot strip of land north of the legal boundary between WRT's property (Lot 1, Block 20) and Boston's property (Lot 1, Block 6). The boundary was originally the centerline of Davenport as identified in the 1902 plat of the Town of Tulsa. The parties stipulated that pursuant to legislation enacted by Congress in 1899, 30 Stat. 990, for the acquisition of railroad rights of way through Indian reservations, lands and allotments, the Missouri, Kansas and Oklahoma Railroad (MK & O) filed a map showing a proposed route for its railroad through a portion of Davenport. The Secretary of the Interior approved this proposal on August 15, 1902. On August 18, 1902, the Town passed Ordinance no. 35 for the purpose of securing a railroad right of way, and vacating a portion of Davenport that included the portion between the WRT and Boston properties. It appears that the proposed railroad approved by the Secretary was operated by MK & O and its successors until the late 1970's or early 1980's. The parties agree that at some point prior to the acquisition of their interests in the Disputed Property any railroad easement covering Davenport had been abandoned.[2]

¶ 6 WRT acquired property immediately south of the Disputed Property in 1992, and claims it began adversely possessing the Disputed Property at that time. Boston acquired its interest in 2001.[3] Prior to 1984, a six-foot tall metal chain link fence was erected on the Disputed Property.[4] The fence extended from the east boundary of Lot 1, Block 6, property to which Boston acquired legal title in 2001, to approximately the west end of Lot 2, Block 6.[5] The fence was removed after the parties sold their interest in 2008, but was originally located twenty feet north of the centerline of Davenport and the south border of Lot 1, Block 6. During the time WRT owned its property, it added a gate and extended the fence from the east end of the original fence on Lot 1, Block 6, south across the Disputed Property; it graded, leveled and added gravel to the Disputed Property, removed shrubs along the fence line and otherwise continuously maintained the Disputed Property without objection from any owner of Lot 1, Block 6, including Boston. In 1992, WRT erected a wire barrier from approximately the middle of the original fence, the west boundary of Lot 1, Block 6, south across the Disputed Property and then improved the area to the west in 1999 and leased that portion of Davenport to a trucking company in 2000.

¶ 7 In 2007, the City of Tulsa enacted Ordinance no. 21698 again vacating a portion of Davenport, including the Disputed Property. Both parties sold their interest in the property in January 2008 to the same buyer. And, as part of those transactions, the parties agreed to hold the proceeds of the sale associated with the Disputed Property in es-

2. WRT does not concede that the railroad easement actually covered the Disputed Property. However, the facts concerning this issue must be construed in the light most favorable to Boston. *Hargrave v. Canadian Valley Elec. Co-op., Inc.*, 1990 OK 43, ¶ 14, 792 P.2d 50, 55.

3. In its answer to WRT's petition, Boston states that it has been the owner of the property in question since the 1970's; however, in the parties' stipulation of facts Boston states that it acquired its interest in the Disputed Property in 2001.

4. WRT acquired other property in the area near the Disputed Property in 1984, and claims the

fence was in place at that time, a fact to which Boston stipulated. An affidavit attached to WRT's reply to Boston's motion for summary judgment claimed that at the time WRT purchased the property directly south of the Disputed Property, both WRT and the seller believed the fence to be the property's northern boundary.

5. In 1992 WRT acquired adjoining property to the west of its Lot 1, Block 20 property, abutting Lot 2, Block 6. Initially, the owner of Lot 2, Block 6 was also named a defendant in this litigation. That defendant settled with WRT, was dismissed from this lawsuit and his property is no longer a subject of the dispute in this case.

crow pending the resolution of this litigation.[6] In February 2008, Boston filed suit to foreclose the right of the City to reopen Davenport across the Disputed Property. The district court granted that relief in a judgment entered in April 2008.

## II. Boston's Contentions

¶ 8 Boston argues essentially one proposition in defense of WRT's claim, that WRT could not have acquired title to the Disputed Property by adverse possession because government property cannot be adversely possessed. The formal statement of Boston's argument is:

No city property can be acquired by adverse possession.

All streets are city property.

No city street can be acquired by adverse possession.

Boston's major premise is generally true; one cannot ordinarily acquire title to government property by adverse possession.[7] *Town of Chouteau v. Blankenship*, 1944 OK 275, ¶ 17, 152 P.2d 379, 383. And, the form of Boston's argument is valid. However, the argument's persuasiveness depends on the accuracy of the minor premise; all streets are city property. For the reasons discussed in this Opinion, we find that once Davenport Street was vacated in 1902 it was no longer municipal property. "All streets" are not the same as "vacated streets." We reach this conclusion by reviewing the ownership of the Disputed Property during the time periods relevant to this case.

### A. Pre–1907 Ownership

¶ 9 Pursuant to an 1833 Treaty, the United States government agreed to grant fee simple title to the land previously assigned to the Creek Nation, and the patent to this land was issued to the Creek Nation in 1852. *Missouri–Kansas–Texas R.R. Co. v. Early*, 641 F.2d 856, 857 (10th Cir.1981). The Original Town of Tulsa was located in Indian Territory within the Creek Nation and existed as a village at least as early as 1895.[8] *Turner v. Kirkwood*, 1934 OK 241, ¶ 2, 31 P.2d 935, 936. In 1898, Congress passed the

6. Boston argues, in part, that WRT lacks standing to claim an interest in the disputed property or the escrowed funds because it sold its interest in 2008 prior to filing suit. This argument is without merit and *Cloer Land Co. v. Wright*, 1993 OK CIV APP 56, 858 P.2d 110, on which Boston relies, is distinguishable from the facts of this case. Although WRT sought relief by filing a Petition to Quiet Title, we find that the relief requested is in the form of declaratory relief, as both parties have conveyed any title they held to the Disputed Property, and now seek to determine ownership of the funds in escrow. "The meaning and effect of an instrument filed in court depends on its contents and substance rather than on the form or title given it by the author." *Whitehorse v. Johnson*, 2007 OK 11, n. 13, 156 P.3d 41.

The Escrow Agreement, signed by Boston and effective June 6, 2008, makes specific reference to this action by describing the district court's style and case number for this case. Further, that agreement provides that WRT and Boston will "proceed to resolve and conclude" that litigation, and directs the escrow agent to "disburse the Escrow Fund to such of the parties as shall have been adjudged or determined to have been vested with the title to the North half of such 'Davenport Street.' "

7. The rule on which Boston relies to argue that prescriptive title to government property could not be acquired was not the early law of Arkansas. Prior to the enactment of an Arkansas statute in 1907, owners of property abutting a street could acquire title to a vacated street from a municipality by adverse possession. *Town of Hoxie v. Gibson*, 150 Ark. 432, 234 S.W. 490 (1921) ("At the time the adverse possession of appellee began there was no exemption in the statute of limitation in favor of incorporated towns."). Further, as discussed in Part II.B, it does not appear that Arkansas cities had the right to reopen a vacated street prior to 1907. Nonetheless, even if we were to assume Tulsa had the authority to reopen Davenport between 1902 and 1907, any such right could be cut off by a successful adverse possession claim according to the law of Arkansas. It is unlikely but undeterminable from this record whether WRT's predecessor began to occupy the Disputed Property prior to 1907. If the moving party has not addressed all material facts, or if one or more of such facts is not supported by acceptable evidentiary material, summary judgment is not proper. *Spirgis v. Circle K Stores, Inc.*, 1987 OK CIV APP 45, 743 P.2d 682 (approved for publication by the Oklahoma Supreme Court). However, WRT is not precluded from making such an argument on remand.

8. It appears the Town of Tulsa was incorporated as a municipality in 1898. *See City of Tulsa v. Southwestern Bell Tel. Co.*, 75 F.2d 343, 346 (10th Cir.1935); *City of Tulsa v. Southwestern Bell Tel. Co.*, 5 F.Supp. 822, 825 (N.D.Okla. 1934).

Curtis Act, 30 Stat. 495, authorizing the allotment of land held by the Creek Nation and the sale of lots within all town sites in Indian Territory. *See Turner,* 1934 OK 241, ¶ 14, 31 P.2d at 938 (noting that as a result of the Curtis Act, those who had made improvements on a lot would have the first option to buy and lots not purchased would be sold at public auction). Contrary to Boston's argument, the laws of the Oklahoma Territory did not apply to Tulsa until 1907. Okla. Const. art. 30, § 2. The laws of the State of Arkansas applied in Indian Territory, and therefore applied at the time the City's easement was vacated. Organic Act, 26 Stat. 81, § 31 (adopted May 2, 1890).

¶ 10 We cannot determine from this record when the private interest in the Disputed Property was first acquired. However, we find that omission immaterial. If the lots had been sold prior to the vacation of Davenport in 1902, they would have been sold subject to the City's street easement. However, the easement is the only interest the City would have owned according to the law of Arkansas.

> This court, in an early decision announced the rule, which has been several times reiterated, that "the interest which the public acquires by the dedication of land for a highway or street is merely an easement or right of passage over the soil, the original owner still retaining the fee, together with all rights of property not inconsistent with the public use."

*Town of Hoxie v. Gibson,* 150 Ark. 432, 234 S.W. 490, 491 (1921) (applying the pre–1907 law of Arkansas) (citations omitted). If the lots were sold between 1902 and 1907, the owners would have held title to their respective property unburdened by the City's easement because "when the streets are vacated or the use abandoned, they revert to the owners of abutting lands." *Id.* The Arkansas rule was reaffirmed in 1906 when Congress specifically authorized all municipalities in Indian Territory to vacate streets and alleys and provided that when vacated, title to the street or alley "shall revert to and become the property of the abutting property owners." 34 Stat. 137, § 12. Therefore, whether the private interest was first acquired

before 1902 or between 1902 and 1907, the lots would not have been subject to the original street easement when Oklahoma became a state.

### B. Post–1907 Ownership

¶ 11 Boston argues nonetheless that Davenport remained public property after the street easement was vacated because it could later be reopened, citing section 42–110 of the Oklahoma Municipal Code, 11 O.S.2011 §§ 1–101 to 55–103. Section 42–110 grants Oklahoma municipalities the absolute right to reopen any previously closed public way or easement, subject to the right of property owners to foreclose a city's right to reopen pursuant to an action authorized by section 42–111. However, the Oklahoma Municipal Code was not enacted until 1977, seventy-five years after Ordinance no. 35 was passed. As of 1885, Arkansas cities had the power to "alter or change the width or extent of streets, sidewalks, alleys, avenues, parks, wharves, and other public grounds, and to vacate or lease out such portions thereof as may not for the time being be required for corporate purposes...." Ark.Code Ann. § 14–54–104. However, we find no provision in the Arkansas statutes in effect prior to 1907 similar to section 42–110 authorizing a city to reopen a vacated street. Further, all existing towns incorporated in Indian Territory continued in the State of Oklahoma. Okla. Const. art. 30, § 10. But, any such change in the form of municipal government did not change or affect any existing rights. Okla. Const. art. 30, § 1. Consequently, whatever new power and authority the City may have acquired after 1907, it could not be exercised to divest the existing rights of property owners.

¶ 12 For a period of time after 1907, the law of Oklahoma was the same as the pre–1907 law of Arkansas. *See McPike v. Avery,* 1925 OK 1007, 249 P. 273. The dispute in *McPike* concerned a thirty foot strip of land north of the centerline of what was originally platted as Laurel Street but later vacated by the City of Tulsa. The Court reviewed the history of statutes governing the vacation of city streets, finding that the first Oklahoma Legislature incorporated the controlling section from the 1890 statutes in effect in Okla-

homa Territory, which had taken the provision from a Kansas statute. *Id.* The Court noted, however, that there was a significant difference between the two statutes. The Kansas statute applied to the vacation of streets and alleys and provided that either could be reopened without expense to a city. The Oklahoma proviso only authorized a city to reopen a vacated alley without compensating the adjoining landowners. This distinction remained until 1923 when the Oklahoma Legislature essentially adopted the Kansas version of the statute permitting a city to reopen a street or alley. *Id.* ¶ 14, 249 P. at 276. Therefore, whether the private interests were acquired before 1907 or between 1907 and 1923, it does not appear that Tulsa had the authority to reopen Davenport, at least absent the payment of compensation not reflected in this record. After 1923, a statutory procedure for reopening a vacated street was available. *Town of Chouteau v. Blankenship*, 1944 OK 275, 152 P.2d 379. This procedure permitted a city to reopen a street but only on the petition of a majority of the abutting property owners. Again, there is also no evidence that the owners of the Disputed Property attempted to do so.

¶ 13 In 1941, the 1923 version of the statute was amended to add a provision, similar to section 42–111, permitting an owner of land to obtain a judgment granting fee simple title after showing that it was not necessary to reopen a vacated or unused street. 11 O.S.1941 § 659. As previously discussed, prior to 1941 a land owner acquired fee simple title to an abutting vacated street by operation of law. Section 659 substituted a statutory procedure for this process. Boston cites *Harper v. Oklahoma City*, 1953 OK 107, 255 P.2d 933, construing this statute, for the proposition that title acquired after a street is vacated is "a conditional fee title, subject to divestiture by the reopening of the street," and that "[t]he only way in which ... title could be converted to one in fee simple was by an action in the District Court ... commenced and prosecuted to judgment as in Sec. 659 provided." *Id.* ¶ 15, 255 P.2d at 937. The holding in *Harper* regarding "conditional title" is in conflict with pre–1941 law, which is not discussed in *Harper*. Therefore, that holding must be limited to the analysis of

section 659, a statute only in effect between 1941 and 1977, when it was repealed by the Municipal Code.

¶ 14 Further, *Harper* does not reconcile section 659 and 69 O.S.2011 § 1202. The latter provides: "An owner of land bounded by a road or street is presumed to own to the center of the way, but the contrary may be shown." Section 1202 was a re-codification of a statute in effect in Oklahoma Territory between 1890 and 1907, and incorporated into the initial law of the State of Oklahoma. *Bd. of Trustees of Town of Taloga v. Hadson Ohio Oil Co.*, 1978 OK 16, n. 1, 574 P.2d 1038. The principle that title to a vacated street reverts to the adjoining landowner has been consistently recognized. "[W]hen ... a street is vacated, its character as such is destroyed, and it is thereafter held in private ownership." *McPike v. Avery*, 1925 OK 1007, ¶ 20, 249 P. at 276 (citing *Atchison, T. & S.F. Ry. Co. v. City of Shawnee*, 183 F. 85, 87 (8th Cir.1910) ("But when, under statutes like that of Oklahoma, a street is vacated, its character as such is destroyed, and it is thereafter held in private ownership, the same as the adjacent lots to which it has accreted.")).

¶ 15 The Oklahoma Supreme Court continued to recognize this principle after the enactment of section 659. *Askins v. British–American Oil Producing Co.*, 1949 OK 45, ¶ 8, 203 P.2d 877, 880, is particularly relevant. Unlike Ordinance no. 35, the city ordinance in *Askins* specifically reserved the right to later reopen the street. Nonetheless, the Court held: "The fact that the street has been vacated does not affect the operation of the rule. Upon the vacation of the street the land to the center thereof attaches to and becomes a part of the adjoining lots." *Id.* ¶ 10. *See Lindauer v. Hill*, 1953 OK 141, ¶ 11, 262 P.2d 697, 699 (decided the same year as *Harper* and holding that a deed from a city could not pass title because the city did not hold title in a proprietary capacity; and, after vacating a street the city owned nothing that it could convey even if it had the authority to do so). "Upon vacation of the street, the land attached to the adjoining lots and the city then owned nothing which could pass by the quitclaim deed...."

*Id.* In both of these cases the vacation of the streets occurred prior to the 1941 amendment to section 659, and the abutting land owner's title to the vacated street did not depend on a judgment obtained pursuant to that section, although it was the law in effect at the time the cases were decided. Versions of the common law rule are now codified at 11 O.S.2011 §§ 42–109(B) ("When any part of a plat has been vacated by decree or written instrument, the owners of the lots so vacated may enclose the public ways and public grounds adjoining the lots in equal proportion"), and 42–113(C) ("When any public way or easement is vacated, the same shall revert to the owners of real estate adjacent to such public way or easement on each side, in proportion to the frontage of the real estate"). *Harper* stands alone in its holding recognizing the concept of "conditional title" to a vacated street. Unlike in *Harper,* there has been no attempt in this case to reopen Davenport pursuant to any statute.[9]

■ ¶ 16 Further, Boston points to no legal principle and cites no case supporting its argument that adoption of section 659 or the 1977 Municipal Code could somehow have divested landowners of their previously established title to the property involved in this dispute.[10] The law in effect at the time the street is vacated determines ownership. *Norman v. Smedley,* 1961 OK 143, 363 P.2d 839. In *Smedley,* an alley separated two tracts of land. In 1920, the City vacated the alley subject to the right of a railroad company's pre-existing easement to use the alley. In 1941, after the initial adoption of section 659, the railroad company removed its tracks and abandoned its easement. Thereafter, the defendants claimed the alley by adverse possession. The Court assumed that when the city vacated its alley, it did not extinguish the railroad easement and found it undisputed that "upon the vacation of a street or alley

[by a municipality] the land to the center thereof attach[ed] to and [became] a part of adjoining lots and blocks." *Id.* ¶ 11, 363 P.2d at 841. The Court reversed the defendants' judgment because possession for fifteen years had not been shown and remanded with directions to enter judgment for the plaintiffs quieting their title to half of the alley. *Id.* ¶¶ 23–25, 363 P.2d at 844. It is significant that before obtaining fee simple title to the portion of the alley abutting their property, the land owner was not required to prove that reopening the alley in the future would be unnecessary pursuant to section 659, although the plaintiffs' action was filed after the statute's enactment.

¶ 17 Finally, Boston's argument does not consider the effect of the Oklahoma Constitution. The Town of Tulsa vacated its easement on Davenport Street on August 18, 1902, when it passed Ordinance no. 35. Ordinance no. 35 was valid and in effect on November 16, 1907, when Oklahoma was admitted to the Union and the Oklahoma Constitution became effective. The Oklahoma Constitution provides: "all valid ordinances now in force in such incorporated cities and towns shall continue in force until altered, amended, or repealed." Okla. Const. art. 30, § 10. Ordinance no. 35 has not been "altered, amended or appealed" since enacted, and therefore was in effect when these parties acquired their respective interests in the Disputed Property.

■ ¶ 18 Consequently, despite the lack of chain of title in the record, Boston's argument that Davenport retained its public nature after 1902 fails in any circumstance. Therefore, whether the private interests in the lots on either side of Davenport were first acquired before or after 1902, once Davenport was vacated the municipal burden on

---

9. In 2008, Boston filed a petition to vacate the street pursuant to the statutory procedure, in order to foreclose the City's right to reopen. However, we find that this had no effect on the Disputed Property because Davenport did not retain its public nature after its vacation as a public street in 1902.

10. We do not address the remote possibility that the private interests in the Disputed Property were first acquired after section 659 or section

42–111 were enacted. Were that shown to be the case, Boston might be entitled to prevail on its motion for summary judgment. However, as provided in 69 O.S.2011 § 1202, the parties' predecessors were presumed to have acquired ownership of their lots to the centerline of the old Davenport easement, although "the contrary may be shown." Boston has made no such showing.

those interests was extinguished, and thereafter, the Disputed Property was unencumbered by the City's street easement.

### C. The 1906 Act

¶ 19 The railroad's interest in the Disputed Property is also critical to Boston's argument because granting of a right of way and vacation of a street are two separate things. *Atchison, T. & S.F. Ry. Co. v. City of Shawnee*, 183 F. 85 (8th Cir.1910). As discussed in *Missouri–Kansas–Texas R.R. Co. v. Early*, in an 1866 treaty, the Creek Nation agreed to grant railroad rights of way across its land, and pursuant to an Act of Congress passed that same year, 14 Stat. 289, railroads that acquired such rights of way acquired the land in fee. 641 F.2d at 860. However, by 1871 Congress had discontinued the practice of granting railroad rights of way in fee. *Great Northern Ry. Co. v. U.S.*, 315 U.S. 262, 274, 62 S.Ct. 529, 534, 86 L.Ed. 836 (1942). And, MK & O did not acquire its right of way pursuant to the 1866 Act. The parties have stipulated that MK & O's right of way was granted by the Secretary of the Interior on August 15, 1902, "[s]ubject to the provisions of the Act of Congress 1899, 30 Stat. 990."

¶ 20 The Act of 1899 was repealed and replaced by a February 28, 1902 Act of Congress, 32 Stat. 43, § 23, but the repeal did not affect the rights of any railroad that had already "accrued." Although MK & O filed its application to survey a proposed route on January 9, 1902, before repeal of the 1899 Act, approval of the proposed route was not granted until after repeal of the 1899 Act. It cannot be determined from this record whether MK & O's right "accrued" on the filing of its application to survey or after the repeal of the 1899 Act. Further, even if it accrued pursuant to the 1899 Act, the 1902 Act provided in section 22 that any railroad with existing rights could acquire the benefits of the 1902 Act by accepting its duties and responsibilities. Whether this may have occurred also cannot be determined from this record. With respect to the nature of MK & O's interest in the Disputed Property, we find it immaterial whether that interest was acquired pursuant to the 1899 or 1902 Act. Based on reasoning in *Midwestern Devs.*,

*Inc. v. City of Tulsa, Oklahoma*, 374 F.2d 683, n. 3 (10th Cir.1967), that we find persuasive, we conclude that pursuant to either statute, a railroad acquired only an easement for its right of way. Further, the rule of reversion applied to abandoned easements was the same whether the easement was derived from the 1899 or the 1902 Act. *See id.* at 686–87.

¶ 21 The conclusion that railroads acquired only an easement pursuant to the 1899 or 1902 Acts is also consistent with a 1906 Act of Congress, 34 Stat. 137, concerning the interests of railroads through Indian Territory. Although Congress did not grant railroads title to the land over which they constructed railroads after 1871, in 1906 Congress did grant certain railroads, including MK & O's successor, the right to purchase title to the land under their rights of way, a grant of authority clearly unnecessary if MK & O obtained title to the land when its right of way over the Disputed Property was approved in 1902. This option was not exercised and neither MK & O nor its successors ever held fee simple title to any portion of the Disputed Property. Consequently, from at least August 15, 1902, when MK & O was granted the right of way, until it was abandoned, MK & O held only an easement for the purpose of a railroad right of way over the Disputed Property. When this easement was abandoned, the Disputed Property was unencumbered.

¶ 22 In addition to its statutory argument, Boston argues that adverse possession of the Disputed Property is precluded by the 1906 Act of Congress: "An Act to provide for the final disposition of the affairs of the Five Civilized Tribes in the Indian Territory, and for other purposes." 34 Stat. 137. As applicable to lands in the Creek Nation, this Act required the conveyance of all lands previously reserved from allotment or sale and held by the Nation for the use or benefit of any "person, corporation, or organization" entitled to the conveyance. Boston relies on section 14, which provides, in part, that conveyancing was not required as to any "land reserved from allotment because of the right of any railroad or railway company therein in the nature of an easement for right of

way...." As previously discussed, although Congress no longer granted fee title to railroad rights of way after 1871, the 1906 Act created a new option granting railroad companies the right to purchase title to the land under a previously granted right of way easement. The Secretary of the Interior set 1908 as the date by which this option had to be exercised and later extended that deadline to June 30, 1909. *Chickasha Cotton Oil Co. v. Town of Maysville, Oklahoma,* 249 F.2d 542, 545–46 (10th Cir.1957). The parties agree that neither MK & O nor its successors exercised the option to purchase the land subject to the railroad easement, including that portion of Davenport in the Disputed Property. Section 14 provided that if a railroad did not exercise its option to purchase its easement, title would pass to either "the owner of the legal subdivision of which the land so abandoned is a part," or, "where lands are within a municipality when title will vest in such municipality." Boston contends that because the Disputed Property is located within a municipality, title vested in the City when the 1906 option was not exercised. We find this contention untenable.

¶ 23 First, section 14 was enacted in the historical context of the 1899 and 1902 Acts previously discussed.

> The purpose [of the 1906 Act] was to avoid the plain evils which would arise from the retention in the tribe as remote dedicator of a strip or other small tract reserved for right-of-way or other railroad use. That is the rationale of the section, and it is in harmony with the legislative purpose of the entire act—to bring to final conclusion the affairs of the tribes.

*U.S. v. Magnolia Petroleum Co.,* 110 F.2d 212, 218 (10th Cir.1939). Therefore, the Act was not intended to affect the status of land owned by individuals or entities other than an Indian tribe or nation. Further, as interpreted by the *Magnolia* Court, Congress enacted section 14 with the general rule in mind that the "entire title and estate" vests in the owner of abutting property on abandonment of an easement. This rule would be frustrated by Boston's interpretation which would divest an abutting land owner of title to property purchased or acquired by opera-

tion of law after abandonment of a railroad easement.

¶ 24 Second, Boston's argument assumes, without demonstrating, the applicability of the 1906 Act. Boston has not shown that the land in question was "reserved from allotment because of the right of any railroad or railway company." As provided in section 11 of the Curtis Act, 30 Stat. 495, enacted March 2, 1898, "all town sites shall also be reserved to the [Creek Nation], and shall be set apart by the commission heretofore mentioned as incapable of allotment." A separate provision of the Curtis Act reserved from allotment all lands occupied by a railroad as a right of way at the time allotment began as well. 30 Stat. 495, § 30.11. It is undisputed that MK & O's application for right of way was not approved until after the plat of the Town of Tulsa had been approved and recorded on June 13, 1902. Consequently, the Disputed Property was "reserved from allotment" pursuant to section 11 of the Curtis Act as a town site and not "because of the right of any railroad or railway company." 34 Stat. 137, § 14.

¶ 25 Further, 1901 legislation ratifying an agreement with the Creek Nation and implementing provisions of the Curtis Act directed the appraisement and allotment of all lands to the citizens of the Creek Nation except "lands herein set apart for town sites." 31 Stat. 861, § 24(a). Land within town sites was to be platted in lots, appraised and sold, and the proceeds collected for the benefit of the Creek Nation to be used to equalize the value of allotments of land made to Creek citizens outside the town sites. As stated, the plat of the Town of Tulsa was recorded on June 13, 1902. And, it is clear from the language of Ordinance no. 35 that when that plat was recorded, no land included in the Disputed Property had been reserved from allotment for a railroad easement granted to MK & O. Consequently, there is nothing in this record to show that MK & O's easement over the Disputed Property had been granted over land reserved from allotment for that purpose, which would be necessary to trigger applicability of section 14 of the 1906 Act.

¶ 26 Finally, the two cases cited by Boston do not support its argument that the Disput-

ed Property became City property when the railroad failed to exercise its option to purchase the land under its easement. In *Chickasha Cotton Oil Co. v. Town of Maysville, Oklahoma,* the land under the railroad easement had been reserved from allotment by the tribes for a railroad pursuant to a 1902 treaty with the Choctaw and Chickasaw Nations. 249 F.2d 542 (10th Cir.1957). The court found that when the railroad failed to exercise its option to purchase provided by the 1906 Act, title to the land subject to the railroad easement vested in the Town of Maysville, rather than the tribes, because it was located within the town when the railroad abandoned its option to purchase. *Id.* In *Fitzgerald v. City of Ardmore,* 281 F.2d 717 (10th Cir.1960), the court found that the city did not own the disputed property because, by the same 1902 treaty with the Choctaw and Chickasaw Nations, the land had been reserved from allotment for a railroad easement. The property abutting the railroad easement was allotted in 1905 after the railroad occupied its easement. In 1916, the allotee platted the land into lots and it was then annexed to the City of Ardmore. The court held that the abutting landowner acquired the fee as of June 30, 1909, when the railroad failed to exercise its option to purchase granted by the 1906 Act. Because the land was not included within a municipality on that date, the original allotee owned title to the land subject to the railroad's right of way easement. *Id.*

¶ 27 Boston's construction of the 1906 Act does not distinguish between the right of way easement and the right to purchase title to the land under the easement. Abandonment of the latter occurred on June 30, 1909, when MK & O's successor failed to exercise its option to purchase title to the land under its easement. *See Chickasha Cotton Oil Co.,* 249 F.2d at 546 (holding failure to purchase title by the Secretary's deadline "constituted abandonment of the title in fee"). There is no construction of the 1906 Act that would affect title to the Disputed Property when the railroad easement was abandoned some seventy years later. Consequently, whether owned by the City or a private party, as of June 30, 1909, the owner of Lot 1, Block 6, and Lot 1, Block 20, owned fee title to the

property subject only to the railroad easement. If either lot was owned by the City on that date, the subsequent conveyance by the City would have conveyed the entire fee estate subject to that easement. *See U.S. v. Magnolia Petroleum Co.,* 110 F.2d 212, 217 (10th Cir.1939) (estate servient to an easement passes to the new owner when the fee to the property out of which the easement was created is conveyed); *U.S. v. Drumb,* 152 F.2d 821 (10th Cir.1946) (pursuant to the Act of 1906, if a railroad abandoned its easement before the land was allotted, title would revert to the tribe, but if the tribe had disposed of the land, title to the easement would follow the land).

¶ 28 At Statehood, all railroads "heretofore or hereafter" constructed were declared to be public highways. Okla. Const. art. 9, § 6. The State of Oklahoma accepted all lands reserved for public highways pursuant to any act of Congress subject to "the vested rights of any tribe, allotee, or other person." Okla. Const. art. 16, § 2. Therefore, when the railroad easement was abandoned there was no interest that could "revert" to the City. Ownership of the land to the center of Davenport had previously vested in the parties' predecessors and the 1906 Act did not operate to divest them of that interest.

### III. Adverse Possession

¶ 29 Although we have resolved that prior to 1992, neither the City nor MK & O's successors owned any interest in the Disputed Property, that does not establish that WRT acquired twenty feet of Boston's property by adverse possession. The record does not contain the parties' chain of title. Nonetheless, if it can be determined that WRT should prevail regardless of when its predecessor first obtained title, the judgment of the district court can be affirmed. *Jacobs Ranch, L.L.C. v. Smith,* 2006 OK 34, ¶ 58, 148 P.3d 842, 857. It is undisputed that the portion of the Disputed Property south of the chain link fence is within the legal description of Boston's property. It is also undisputed that the fence between the Boston and WRT properties was in place for more than the fifteen year prescriptive period. "Occupancy for the period prescribed by civil pro-

cedure, or any law of this state as sufficient to bar an action for the recovery of the property, confers a title thereto, denominated a title by prescription, which is sufficient against all." 60 O.S.2011 § 333.

¶ 30 As stated, WRT claims the Disputed Property by adverse possession. "In order to establish adverse possession, it must be shown that the possession was hostile, under claim of right or color of title, actual, open, notorious, exclusive, continuous, and for the statutory period of time." *Fadem v. Kimball*, 1979 OK CIV APP 40, ¶ 7, 612 P.2d 287, 290 (approved for publication by the Oklahoma Supreme Court).

> Possession to be adverse must be open, visible, continuous and exclusive, with a claim of ownership, such as will notify parties seeking information upon the subject that the premises are not held in subordination to any title or claims of others, but against all titles and claimants.

*Carson v. Keith*, 1967 OK 206, ¶ 10, 433 P.2d 956, 958 (quieting title to property between a fence and the record boundary of the property in favor of an adverse claimant). Generally, the construction of a fence and the improvement and maintenance of property within the fence have been held to satisfy the open, hostile and notorious requirement.

> The exclusive, open, and hostile acts of dominion in *Fadem* were fencing the land and raising cattle on it. The exclusive, open, and hostile acts of dominion in this case are the acts of the Zellars in fencing the property, cultivating the property by the removal of brush and the application of fertilizer, and raising cattle on it.

*Krosmico v. Pettit*, 1998 OK 90, ¶ 16, 968 P.2d 345, 349 (citing *Fadem*, 1979 OK CIV APP 40, 612 P.2d 287) (quieting title to property mistakenly included within a fence).

> When a person builds a fence on what he thinks is the boundary line between his and his neighbor's land and uses the land and occupies the land actually, openly, notoriously, exclusively and hostilely for fifteen years, the fence will be adjudged to be the boundary between the properties.

*Smith v. Pettijohn*, 1961 OK 246, ¶ 0, 366 P.2d 633 (Syllabus 2) (finding a fence existing when adverse claimant purchased the property constituted the boundary). *Accord Johnson v. Whelan*, 1940 OK 68, ¶ 0, 98 P.2d 1103 (Syllabus 3):

> Where the owner of a town lot, in ignorance of the true boundary between his lot and the adjoining lot of another party, and under the mistaken belief that it is his property, encroaches on a portion of the adjoining lot and erects a part of a structure thereon, and occupies such portion of said lot and maintains such structure thereon openly, peaceably, and exclusively for more than 15 years, he acquires title to such portion of the adjoining lot by prescription, sufficient against all.

WRT's acts are consistent with occupancy and control of the Disputed Property for more than fifteen years, similar to the acts recognized in these cases as sufficient to establish title by prescription. What the record does not show is whether these acts were "hostile, under claim of right." *See Fadem*, 1979 OK CIV APP 40, ¶ 7, 612 P.2d at 290.

¶ 31 WRT addressed this issue by submitting the affidavit of its President, in which he states his belief that the fence was the boundary of WRT's property, in part because the Disputed Property had been used as a parking lot and driveway by the owner of Lot 1, Block 20, since at least 1984. Boston did not contest the affidavit with conflicting evidence or submit an affidavit supporting its position.

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must, by affidavits or as otherwise provided in this rule, set out specific facts showing a genuine issue for trial.

12 O.S.2011 § 2056(E). Instead, Boston argued in its Reply to Plaintiff's Reply Brief that the statements in the affidavit were "conclusory and self-serving." "Evidentiary material that does not appear to be convertible to admissible evidence at trial shall be challenged by objection or motion to strike, or the objection shall be deemed waived for the purpose of the decision on the motion for summary judgment or summary disposition." Rule 13(c), Rules for the District

Courts, 12 O.S.2011, ch. 2, app. Boston did not follow the procedure required by Rule 13(c). However, even though Boston waived its objection to the substance of the affidavit, summary judgment may only be granted "if appropriate." 12 O.S.2011 § 2056(E). We find no difference between this statutory requirement and existing case law. *See Spirgis v. Circle K Stores, Inc.,* 1987 OK CIV APP 45, 743 P.2d 682 (approved for publication by the Oklahoma Supreme Court) ("if the motion for summary judgment is not well-taken, the failure of the opposing party to respond does not mean that the motion must be granted by the court").

¶ 32 What remains unresolved by this record are the circumstances pursuant to which the fence was erected, and whether the use of the property by WRT's predecessor in title was hostile. *Francis v. Rogers,* 2001 OK 111, 40 P.3d 481, illustrates why summary judgment in favor of WRT is not warranted at this stage of the proceedings. In *Francis,* the disputed property was part of a tract of land originally held by Hendricks. East and west tracts of this land were separated by a railroad. In 1962, Hendricks sold the west tract to Rogers. Although the evidence was conflicting, there was testimony that in 1963 the parties agreed to and did construct a fence on the Hendricks' side of the railroad to keep cattle from crossing the railroad tracks. Rogers began to use the property west of the fence to graze cattle when trains stopped running in 1980. In 1986, the railroad abandoned its right of way. Rogers claimed the property to the fence line by adverse possession. The Court held that Rogers failed to prove adverse possession by clear and positive proof. *Id.* ¶ 17, 40 P.3d at 486–87.

¶ 33 "Acquisition by prescription is disfavoured." *Willis v. Holley,* 1996 OK 107, ¶ 6, 925 P.2d 539, 541.

It is settled law in this jurisdiction that one claiming title by adverse possession has the burden of proving all facts necessary to establish such title and that to establish same the proof must be clear and positive and all inferences and presumptions are in favor of the rightful owner.

*Norman v. Smedley,* 1961 OK 143, ¶ 16, 363 P.2d 839, 843.

To obtain title to property by prescription, all elements of adverse possession must be established by clear and positive proof and cannot be established by inference. Adverse possession is to be taken strictly, and every presumption is in favor of possession in subordination to the rightful owner.

*Tindle v. Linville,* 1973 OK 64, ¶ 8, 512 P.2d 176, 178. WRT must establish adverse possession by "clear and positive" proof without reliance on inferences. *Id.* This heightened burden of proof is critical at the summary judgment stage. When considering a motion for summary judgment, the evidence and the inferences to be drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Hargrave v. Canadian Valley Elec. Coop., Inc.,* 1990 OK 43, ¶ 14, 792 P.2d 50, 55.

¶ 34 Therefore, although WRT has established open and continuous occupancy for more than the prescriptive period, in this summary judgment proceeding it is not entitled to the inference that its occupancy was hostile. A similar omission, i.e., the fence was intended by the adjoining property owners to be the boundary, defeats WRT's border by acquiescence argument. That common law rule requires that a fence be "mutually recognized" as the border. *Comstock v. Little,* 1961 OK 35, ¶ 0, 359 P.2d 704 (Syllabus 1); *McGlothlin v. Livingston,* 2012 OK CIV APP 48, 276 P.3d 1042. WRT is not precluded on remand from attempting to prove border by acquiescence, as an alternative to the claim of acquisition of title by adverse possession, if the facts produced support such a claim.

¶ 35 Because of the length of time involved, it may be that the parties have produced all of the evidence available on this issue. We are unable to so conclude on the basis of this record. "Before an appellate court can order an action, or any part of it, terminated on a judgment's reversal for insufficiency of the evidence, it must appear that the appellee cannot recover on a new trial-it is not enough that recovery appear improbable." *Guinn v. Church of Christ of Collinsville,* 1989 OK 8, ¶ 22, 775 P.2d 766, 775. We therefore reverse the judgment of the district court in this limited respect and

remand for a determination of whether occupancy of the Disputed Property was hostile; and, if necessary, whether the fence was mutually recognized as the boundary by the previous property owners. All other issues necessary to the judgment appealed are affirmed and shall not be retried on remand. *Fent v. Oklahoma Natural Gas Co.*, 1994 OK 108, ¶ 13, 898 P.2d 126, 133 (all issues resolved by an appellate decision either expressly or impliedly become the law of the case and are not subject to review in a subsequent appeal).

### CONCLUSION

¶ 36 Tulsa abandoned its right to a street easement over the Disputed Property in 1902. When the railroad abandoned its easement sometime prior to 1984, Lot 1, Block 6, and Lot 1, Block 20, were unencumbered by either a street or railroad easement. At that point title to the properties, including the twenty foot strip along the south border of Block 6, could be acquired by adverse possession. The fence between the WRT and Boston properties was erected prior to 1984 and separated the two properties. WRT has established open and continuous occupancy of the Disputed Property for more than the required prescriptive period. However, it has not established whether its occupancy was hostile, or that the fence was "mutually recognized" as the boundary by the parties' predecessors in title. The district court found that WRT established the elements of adverse possession by clear and positive proof. Other than with respect to whether WRT's occupancy was hostile, the district court's finding is affirmed. The judgment of the district court is affirmed in part, reversed in part, and this case is remanded for a determination of the nature of WRT's occupancy of the Disputed Property consistent with this Opinion.

¶ 37 **AFFIRMED IN PART, REVERSED IN PART AND REMANDED FOR FURTHER PROCEEDINGS.**

BARNES, P.J., and WISEMAN, J., concur.